UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

|  |  |
|---|---|
| THE PRINCETON EXCESS AND SURPLUS LINES INSURANCE COMPANY, <br><br>             Plaintiff, <br><br> v. <br><br> NANCY CARABALLO, MICHELLE RODRIGUEZ, as the Administrator of the ESTATE OF JORDAN RODRIGUEZ, CATHOLIC CHARITIES CORPORATION, and THE ROMAN CATHOLIC DIOCESE OF CLEVELAND, OHIO, <br><br>             Defendants. | Case No. <br><br><br> **JURY TRIAL DEMANDED** |

## COMPLAINT FOR DECLARATORY JUDGMENT

The Princeton Excess and Surplus Lines Insurance Company ("PESLIC") for its Complaint for Declaratory Judgment against Nancy Caraballo ("Caraballo") and Michelle Rodriguez as the Administrator of the Estate of Jordan Rodriguez ("Estate") states as follows:

### NATURE OF THE ACTION

1.     This action arises out of a material breach of insurance policies by Defendant Nancy Caraballo, who has entered an unreasonable and collusive $36 million settlement with the Estate of Jordan Rodriguez ("Jordan"), a 5-year-old Cleveland boy who died tragically in late 2017, and whose body was discovered buried in his mother's backyard. In connection with that tragic death, Caraballo pleaded guilty to four felonies concerning a benefits-fraud scheme she entered into with

Jordan's mother, which she tried to cover up by falsifying records related to her work purporting to provide Jordan's mother with services as a parent educator.

2.     Prior to Caraballo's breach, PESLIC, as the insurer of Caraballo's former employer, Catholic Charities Corporation ("Catholic Charities"), was supporting good faith settlement discussions for a reasonable resolution with the Estate on behalf of both Caraballo and Catholic Charities.  PESLIC had also agreed to reimburse Caraballo's covered defense costs despite several policy defenses asserted under a reservation of rights.  Caraballo was informed repeatedly that any settlement with the Estate in excess of the policies' $1 million retained limit required the consent of PESLIC.  Rather than honor her obligations to PESLIC, Caraballo agreed to a $36 million settlement, an amount that no independent rational actor would agree to pay.  Indeed, Caraballo knew she would never have to pay this settlement, because the settlement provides that the Estate would never enforce it against her.  Caraballo's material breach of the obligations imposed by the policies prevents both her and the Estate from obtaining indemnification or any other benefits from PESLIC.

3.     Even aside from Caraballo's material breach of the policies, numerous policy defenses—to which PESLIC had reserved rights while Caraballo was cooperating with it— eliminate any coverage obligation.  For example, Caraballo cannot establish a right to coverage, given that her felonious conduct clearly was not "within the scope of [her] duties for" Catholic Charities, and she therefore does not constitute an "Insured" under the plain language of the policies.  The policies also exclude "[a]ny liability arising out of any criminal … act … of an Insured"—exactly what the Estate has alleged against Caraballo and to which Caraballo has already pleaded guilty.  These and numerous other defenses bar the Estate from recovery under the settlement, even if Caraballo had not breached the policies (which she plainly did).

4. The Estate has made threats of imminent litigation against PESLIC and has thus created an actual, present, and justiciable controversy that is appropriate for resolution by this Court.

## THE PARTIES

5. PESLIC is an insurance company incorporated under the laws of the State of Delaware, with its principal place of business in Princeton, New Jersey.

6. Caraballo is a natural person who, upon information and belief, is a citizen of the state of Ohio.

7. Michelle Rodriguez is the legal representative of the Estate, which is an estate established by Ohio law of a decedent who was a citizen of the state of Ohio.

8. Catholic Charities is a corporation incorporated under the laws of the State of Ohio and has its principal place of business in Cleveland, Ohio. Catholic Charities is named as a necessary party only.

9. The Roman Catholic Diocese of Cleveland, Ohio ("Diocese") is an entity organized under the laws of Ohio and has its principal place of business in Cleveland, Ohio. The Diocese is named as a necessary party only.

## JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1), as the plaintiff is a citizen of a different state from all defendants, and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs. This Court has jurisdiction to issue declaratory relief pursuant to 28 U.S.C. § 2201.

11. All defendants are citizens of Ohio and subject to general personal jurisdiction in Ohio.

3

12.    Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this action occurred in this district.

## FACTUAL BACKGROUND

**Catholic Charities And Caraballo**

13.    Catholic Charities is a Roman Catholic organization that provides a range of social services.  From 2013 to 2017, Catholic Charities entered into annual contracts with Educational Service Center of Cuyahoga County, on behalf of Help Me Grow of Cuyahoga County (later rebranded as Bright Beginnings Parents as Teachers) to provide certain parenting education services.  In July 2013, Catholic Charities hired Caraballo as one of its employees providing these services as a "Parent Educator."

14.    Caraballo was not a licensed social worker, and did not hold any other form of professional license.  A professional license was not required for her job duties.

15.    Caraballo was assigned to provide Jordan's mother, Larissa Rodriguez ("Larissa"), parenting education services under the Parents as Teachers program.  Notably, Jordan was never enrolled in this program.  Jordan was instead enrolled in a separate Bright Beginnings program that was not administered by Catholic Charities or Caraballo.

16.    Beginning in approximately July 2015, Caraballo and Larissa began a scheme under which Larissa would sell her Electronic Benefits Transfer ("EBT") card to Caraballo for half its value in cash.  Caraballo would use the EBT card to purchase food for herself; Larissa would use the cash to pay for items she was unable to pay for with her EBT card, including rent, cell phone bills, diapers, and funding her boyfriend's prison commissary.  To cover up this criminal scheme, Caraballo began falsifying home visitation reports she was required to file to confirm her

4

visits to Larissa's home.  None of this illegal conduct was within the scope of Caraballo's legitimate employment by Catholic Charities.

17.     Caraballo and Larissa were later indicted for these crimes.  On April 2, 2018, Caraballo pleaded guilty to four felonies: trafficking in or illegal use of food stamps, in violation of O.R.C. § 2913.46(B); grand theft, in violation of O.R.C. § 2913.02(A)(2); and two counts of tampering with records, in violation of O.R.C. § 2913.42(A)(1).  On April 26, 2018, Caraballo was sentenced to three years in prison.

**The Underlying Action Against Catholic Charities And Caraballo**

18.     On January 15, 2019, Michelle Rodriguez, as the administrator of Jordan's Estate, filed suit against Catholic Charities and Caraballo, among others, related to Jordan's death in 2017.

19.     According to the Second Amended Complaint filed in that action, Jordan was a developmentally disabled child who could not speak, and suffered from chronic lung disease and congenital abnormality of the kidneys.  *See* Second Amended Complaint ("SAC") ¶ 20, *Michelle Rodriguez v. Catholic Charities Corp., et al.*, No. CV-19-909566 (Ohio Ct. Com. Pl., Cuyahoga Cty. Oct. 7, 2020).[1]

20.     Jordan lived with Larissa, his siblings, and Larissa's boyfriend Christopher Rodriguez ("Christopher," who shares a last name with Jordan but is not related to him), in Larissa's home in Cleveland.  *See id.* ¶ 21.  On approximately September 21, 2017, Jordan slipped into unconsciousness, but was not given medical attention by Larissa or Christopher.  *See id.* ¶ 39. Jordan died on approximately September 22, 2017, at age 5.  *See id.*  Christopher buried Jordan in their backyard later that day.  *See id.* ¶ 40.

---

[1] A true and correct copy of the SAC is attached hereto as Exhibit A.  PESLIC does not concede the truth of the SAC's allegations.

21.     In December 2017, Jordan's body was discovered, leading to criminal prosecutions against Larissa and Christopher.  *See id.* ¶ 41.  Larissa was also prosecuted for the benefits fraud she perpetrated with Caraballo.  Larissa and Christopher eventually pleaded guilty to numerous crimes related to Jordan's death, and were each sentenced to more than 20 years in prison.

22.     The SAC alleges that Jordan's death was caused by "nutritional and medical neglect." *Id.* ¶ 39.  This neglect grew directly out of the criminal scheme of Larissa and Caraballo, "who deprived Jordan of necessary food and nutrition by selling the benefits from the [EBT] card." *Id.* ¶ 32.  The SAC specifically alleges that Caraballo "[c]ontributed and caused Jordan to become malnourished and starve as a result of purchasing [Larissa's] EBT benefits."  *Id.* ¶ 76(a).

23.     The SAC also alleges that Caraballo was "a mandatory reporter of child abuse and neglect and suspected child abuse and neglect as provided in O.R.C. § 5123.61 and O.R.C. § 2151.421."  *Id.* ¶ 16.  Despite this alleged obligation, Caraballo "failed to immediately report [her] knowledge of reasonable cause to suspect that Jordan suffered or faced the threat of suffering from neglect[,] abuse or injury."  *Id.* ¶ 85.  This failure allegedly caused Jordan "harms, losses and a wrongful death."  *Id.* ¶ 86.

24.     Based on these allegations, and others, the SAC asserts five causes of action against Caraballo: Wrongful Death – Reckless, Willful, and Wanton; two counts of Wrongful Death – Negligence; Survival Action – Negligence; and Statutory Failure to Report.

**The PESLIC Policies**

25.     PESLIC operates as a domestic surplus lines insurer in Delaware, and operates as a surplus lines insurer in all other states and the District of Columbia.  Surplus lines coverage can only be placed by or through a licensed surplus lines broker, and thus is issued only to commercial entities and other highly sophisticated insureds.

26.     In February 2017, PESLIC issued a Retained Limit Policy No. N2-A3-RL-0000008-10 ("2017 Policy") to the Diocese, covering the period from January 1, 2017 to January 1, 2018.  PESLIC issued several other materially similar Retained Limit Policies to the Diocese, including No. N2-A3-RL-0000008-12 ("2019 Policy"), which covered the period from January 1, 2019 to January 1, 2020.  True and correct copies of the 2017 Policy and 2019 Policy are attached hereto as Exhibits B and C, respectively.  The 2017 Policy and 2019 Policy will be referred to collectively as the "Policies."

27.     The Policies provide the Diocese with $10 million in aggregate coverage excess of a $1 million "Retained Limit."  The Policies specify that only one set of limits applies to all claims "arising from the same Occurrence, Accident, or Wrongful Act," even if multiple policies are triggered.  2017 Policy, Amendment – Retained Limit and Excess Limit, ¶ C.[2]

28.     Coverage under the Policies is available to Insureds, which is defined to include the Diocese; any organization "owned, controlled, or operated by the" Diocese; and "[a]ll of your current or former employees" "[w]hile acting within the scope of their duties for" the Diocese or its organizations.  2017 Policy, Liability Conditions, Definitions, and Exclusions, Definition 21.b.3 & Endorsement No. RL 2032B.

29.     Unlike many liability insurance policies that impose duties on the insurer while a claim is being litigated, the Policies issued by PESLIC impose only a duty of indemnification.  The Policies expressly state that PESLIC has "no duty to defend a Claim against an Insured."  2017 Policy, General Liability Coverage Part, ¶ B.1; *see also* 2019 Policy, Wrongful Act Liability Coverage Part, ¶ B.1; 2019 Policy, Miscellaneous Professional Liability Coverage Part, ¶ B.1.  The

---

[2] Unless noted, citations to the 2017 Policy apply equally to the 2019 Policy, and vice versa.

insured, not PESLIC, is "responsible for the administration, investigation or settlement of any loss damage, expense or Claim covered under" the Policies. 2017 Policy, Liability Conditions, Definitions, and Exclusions, Condition H.5.a. PESLIC also "assume[s] no liability for you or your administration, investigation or settlement of any loss, damage, expense or Claim." *Id.* Given the scope of PESLIC's duties, the Policies expressly provide that: "[t]his policy will NOT apply until you are obligated to pay the amount of the Retained Limit covered under this policy." 2017 Policy, Liability Conditions, Definitions, and Exclusions, Condition G.

30. The indemnification coverage provided under the Policies is contained in separate coverage parts, three of which are relevant here: (1) the General Liability ("GL") Coverage Part, (2) the Wrongful Act Liability ("WAL") Coverage Part, and (3) the Miscellaneous Professional Liability ("MPL") Coverage Part. The GL Coverage Part is occurrence-based, meaning it is triggered when the underlying occurrence takes place, while the WAL and MPL Coverage Parts are claims-made coverages, and are triggered when a claim is made against the insured. As a result, the 2017 Policy is relevant for GL Coverage because Jordan died in 2017; the 2019 Policy is relevant for WAL and MPL Coverage, as the underlying lawsuit was filed against Caraballo in 2019.

31. Under the GL Coverage Part, PESLIC agreed (in relevant part):

> to indemnify Insureds for Ultimate Net Loss, in excess of the Retained Limit, that results from damages the Insured becomes legally obligated to pay because of Bodily Injury … to which the insurance under this Coverage Part applies, provided that: [among other things] The Bodily Injury … is caused by an Occurrence … [and] [t]he Occurrence occurs during the Policy Period….

2017 Policy, GL Coverage Part, ¶ A.1. The Policies define "Bodily Injury" to mean: "Injury to the body, sickness or disease, including death resulting from any of these at any time, and if arising out of the foregoing: mental anguish, mental injury, disability, shock or fright." 2017 Policy, Liability Conditions, Definitions, and Exclusions, Definition 6. The Policies define "Occurrence"

to mean, in relevant part: "an accidental happening, including continuous or repeated exposure to substantially the same general harmful conditions which results in Bodily Injury…."  *Id.*, Definition 26.a.

32.     Under the WAL Coverage Part, PESLIC agreed to indemnify for loss in excess of the Retained Limit that the Insured becomes legally obligated to pay because of a Wrongful Act, which is defined to mean: "Any actual or alleged tortious error, act, omission, misstatement, misleading statement, neglect or breaches of duty committed by an Insured…."  2019 Policy, Liability Conditions, Definitions, and Exclusions, Definition 37.

33.     Under the MPL Coverage Part, PESLIC agreed (in relevant part): "to indemnify Insureds for Ultimate Net Loss, in excess of the Retained Limit, that results from damages the Insured becomes legally obligated to pay because of a Wrongful Act arising out of a Miscellaneous Professional Service…."  2019 Policy, MPL Coverage Part, ¶ A.1.  Miscellaneous Professional Services is defined to mean: "only those Professional Services or individuals specifically described in the Schedule of Professional Services attached to this Coverage Part."  *Id.*, ¶ F.2.  The Policies define "Professional Services" to mean, in relevant part: "Services that may be legally performed only by a person holding a professional license."  2019 Policy, Liability Conditions, Definitions, and Exclusions, Definition 27.  The Schedule of Professional Services that further defines Miscellaneous Professional Services lists six types of Professional Services, including, as relevant here: "Religious Institution Counseling Services: meaning any Wrongful Act arising out of counseling services consisting of consultations, communications, giving advice or guidance with regard to conduct or proposed conduct."  2019 Policy, MPL Coverage Part, Schedule of Professional Services, ¶ 1.

34.     All three coverage parts are subject to exclusions, which eliminate coverage that might otherwise be available under the Policies.  One of these exclusions ("Exclusion 9") specifies that:

> The insurance under any Liability Coverage Part in this policy does NOT apply to: … Any liability arising out of any criminal, fraudulent, dishonest act, or bad faith of an Insured or arising from the deliberate violation of any federal, state, or local statute, ordinance, rule or regulation committed by or with the knowledge of an Insured.

2017 Policy, Liability Conditions, Definitions, and Exclusions, Exclusion 9.

35.     Another exclusion ("Exclusion 3") specifies, in relevant part, that: "The insurance under any Liability Coverage Part does NOT apply to … Any liability arising out of [] The rendering or failure to render … Any service or treatment conducive to health or of a professional nature."  *Id.*, Exclusion 3.  However, Exclusion 3 does not bar coverage under the MPL Coverage Part.  *See* 2019 Policy, MPL Coverage Part, ¶ E.1 (Exclusion 3).

36.     In addition, the individual coverage parts contain exclusions that apply to those parts alone.  The GL Coverage Part contains an exclusion (the "GL Expected or Intended Injury Exclusion") that provides, in relevant part: "The insurance under this Coverage Part in this policy does NOT apply to: … Bodily Injury … either expected or intended from the standpoint of an Insured."  2017 Policy, GL Coverage Part, ¶ E.2.

37.     The WAL Coverage Part contains an exclusion (the "WAL Bodily Injury Exclusion") that provides, in relevant part: "The insurance under this Coverage Part does NOT apply to … Any Bodily Injury…."  2019 Policy, WAL Coverage Part, ¶ E.9.

38.     The MPL Coverage Part contains an exclusion (the "MPL Custodial Care Exclusion") that provides:

> [T]his insurance will not apply to … Liability resulting from the Insured's acceptance and/or undertaking of custodial care or responsibility of any person. This exclusion applies only if you undertake such custodial care or responsibility

at the request, instruction, authorization, or direction of a governmental agency, authority, board, or officer having such authority or responsibility.

2019 Policy, MPL Coverage Part, Schedule of Professional Services, ¶ 1.c.

39. PESLIC's indemnification duty under the Policies will be triggered "[w]hen the amount of Ultimate Net Loss has finally been determined as provided in the Defense and Indemnity provision in the Coverage Part." *Id.* The Policies define "Ultimate Net Loss" to mean, in relevant part: "The sums for damages for which an Insured is legally liable by reason of a judgment, or an arbitration award entered as a judgment, or a settlement executed by you and the claimant, and shall include defense costs, arising out of an Accident, Occurrence or Wrongful Act…." 2017 Policy, Liability Conditions, Definitions, and Exclusions, Definition 44. The Policies also specify: "Your legal obligation to pay the Ultimate Net Loss must be evidenced either by a judgment against you after the actual trial, or by an arbitration award entered as a judgment, or by a written settlement executed by you and the claimant." 2017 Policy, General Liability Coverage Part, ¶ B.5; *see also* 2019 Policy, Wrongful Act Liability Coverage Part, ¶ B.5; 2019 Policy, Miscellaneous Professional Liability Coverage Part, ¶ B.5.

40. PESLIC is only obligated to indemnify for settlements to which it consented. Specifically, the Policies require that: "You must obtain our prior written approval before offering or agreeing to pay an amount which is in excess of the Retained Limit in order to settle any Claim under [the applicable] Coverage Part." 2017 Policy, General Liability Coverage Part, ¶ B.6; *see also* 2019 Policy, Wrongful Act Liability Coverage Part, ¶ B.6; 2019 Policy, Miscellaneous Professional Liability Coverage Part, ¶ B.6. In addition, the Policies provide that: "Your rights and duties under this insurance may NOT be transferred without our written consent except in the case of death of an individual insured." 2017 Policy, Policy Conditions, ¶ I. These duties are consistent with the duty to "[p]rovide your full cooperation as stated in this policy," which the

Policies also require.    2017 Policy, Liability Conditions, Definitions, and Exclusions, Condition H.3.

41.    When the Ultimate Net Loss has been established in one of the permitted ways, PESLIC "will promptly indemnify you the amount of the Ultimate Net Loss covered under this policy."  2017 Policy, Liability Conditions, Definitions, and Exclusions, Condition G.

**PESLIC Communicates With Caraballo And Monitors The Underlying Action, Although No Reasonable Settlement Opportunity Arises**

42.    In January 2019, PESLIC was given notice of the underlying action against Catholic Charities and Caraballo.  PESLIC was not given prior notice of Jordan's death, despite its discovery in December 2017 and Caraballo's guilty plea in April 2018.

43.    On June 28, 2019, PESLIC wrote to Caraballo's counsel in the underlying action and advised him that PESLIC was monitoring the action and evaluating whether coverage may eventually be available under the Policies.   PESLIC also reserved rights under numerous provisions of the Policies that might affect coverage.

44.    In addition to reserving rights, PESLIC promptly informed Caraballo's counsel of certain coverages that were not available.  PESLIC denied coverage under the WAL Coverage Part of the 2019 Policy due to the WAL Bodily Injury Exclusion, because the Estate's lawsuit sought damages related entirely to Bodily Injury.  *See* 2019 Policy, WAL Coverage Part, ¶ E.9.  PESLIC also denied coverage under the WAL and MPL Coverage Parts of the 2017 Policy, as they were claims-made coverage and no claim was reported until 2019.  Finally, PESLIC denied coverage under the GL Coverage Part of the 2019 Policy, as no Occurrence was alleged to have taken place during that policy period.

45.    PESLIC sent a supplemental reservation of rights letter to Caraballo's counsel on July 30, 2021, raising several additional provisions of the Policies that might impact coverage.

46.     Throughout the time that PESLIC has monitored the underlying action, the Estate has never made a settlement demand within PESLIC's $10 million limits.

47.     On September 28, 2020, the Estate made a $33 million settlement demand to Catholic Charities to resolve the Estate's claims against that entity alone.  On December 22, 2020, Catholic Charities stated that this demand was premature, but that Catholic Charities remained willing to engage in mediation.

48.     Over the next several months, the parties in the underlying action discussed the possibility of pursuing mediation.  But on July 12, 2021, counsel for the Estate informed an attorney for Catholic Charities that: "I am not interested in attending a mediation where the primary policies [i.e., the PESLIC Policies] are at issue.  I would need a formal offer of those limits, and acknowledgement that we are in the excess coverage limits before proceeding."  In other words, the Estate demanded that PESLIC pay out its entire policy limits before the Estate would even begin to discuss the possibility of settlement.

49.     A month later, on August 12, 2021, PESLIC attended a settlement conference in the underlying action, and consented to a settlement offer of $1 million on behalf of Caraballo and Catholic Charities.  The Estate responded to the $1 million offer by lowering its demand from $33 million to $32.5 million—still tens of millions of dollars more than PESLIC's limits, and tens of millions more than would be reasonable.

**Caraballo Settles Without PESLIC's Consent, And The Estate Threatens To Sue PESLIC**

50.     In late August 2021, PESLIC learned for the first time that Caraballo was considering entering into a settlement with the Estate in violation of her obligations under the Policies.

51.     On August 30, 2021, the Estate filed a Pre-Trial Memorandum as to its claims against Caraballo and one other remaining defendant.  The Estate advised the court that it had

13

reached a "general potential agreement" with Caraballo "in principal [sic] with final details to be worked out." The Estate further represented that it and Caraballo wished to "resolve the case" through a one-day bench trial without any witnesses being called, and without any adversary proceedings. Instead, the Estate and Caraballo would submit depositions, "agree upon certain stipulations," and "suggest an amount to the court to assist in the Court's determination of damages." "In consideration" for this agreement, the Estate had promised that it "will not seek to collect the judgment against [] Caraballo individually, and [] Caraballo would convey an assignment of the declaratory judgment action against the insurers." The parties further agreed that "there would be no appeal." The clear purpose of this show trial would be to manufacture coverage under the Policies and avoid findings of facts that would defeat coverage—all without the risk of a contested proceeding where liability and damages would be disputed. Caraballo has never disputed the Estate's statements to the Ohio court.

52. On September 3, 2021, PESLIC wrote to Caraballo's counsel to warn against entering into the settlement agreement described by the Estate. PESLIC reminded Caraballo that it was supporting good faith settlement discussions for a reasonable resolution with the Estate, and asked Caraballo to "cooperate with PESLIC and allow it to continue to engage in reasonable settlement discussions." PESLIC advised Caraballo that entering into a settlement agreement without its consent would violate the Policies.

53. Despite PESLIC advising Caraballo of her obligations under the Policies, she continued to collude with the lawyers for the Estate and breach the Policies. On September 8, 2020, counsel for the Estate wrote to the court in the underlying action, and represented that "[a]fter deliberation, [the Estate] and Defendant Nancy Caraballo have reached an agreement to enter the following Consent Judgment." The proposed Consent Judgment offered a skewed set of proposed

"findings" and included a judgment for the astronomical sum of $36 million—$3.5 million more than the Estate's most recent settlement offer.

54.     On September 9, 2021, PESLIC again wrote to Caraballo's counsel to warn that entering into this collusive settlement would "breach the PESLIC Policy."  Nonetheless, PESLIC confirmed that if Caraballo "rescinds the proposed consent judgment and does not enter into any other type of settlement with [the Estate], then PESLIC stands ready to indemnify [Caraballo's] covered defense costs, including reasonable expert fees, and any covered judgment entered against her after an actual trial on the merits."

55.     Caraballo unfortunately did not heed PESLIC's pleas and adhere to the obligations imposed by the Policies.  On September 10, 2021—the same day the Ohio court stayed the underlying action pending an appeal brought by Catholic Charities concerning an immunity defense that would benefit Caraballo as well—the Estate's counsel wrote the Court (copying Caraballo's counsel) and represented that: "Defendant Nancy Caraballo and [the Estate] have entered a settlement agreement regardless of a consent Judgment.  We will forward a motion to dismiss Nancy Caraballo individually from the case next week."  As the underlying action remains stayed, no such motion has been filed.

56.     On September 20, 2021, counsel for the Estate wrote to Catholic Charities, PESLIC, and an excess insurer, and reiterated that the Estate "has reached a settlement with Defendant Nancy Caraballo individually for $36,000,000."  The Estate demanded that it be paid this settlement amount by October 20, 2021, and in exchange, the Estate would "withdraw any future claims for the prejudgment interest."  Catholic Charities was not covered by the settlement.

57.     On October 14, 2021, PESLIC wrote to counsel for the Estate and requested that the Estate provide a signed copy of the settlement agreement, while noting that any such signed

agreement would constitute a breach of the Policies.  That same day, the Estate's counsel responded in part (copying Caraballo's counsel): "we can easily provide signed copies to you. … You have answered our letter in full, and we will act accordingly."

58.     The settlement agreement between Caraballo and the Estate concludes the underlying litigation against Caraballo, as there is no remaining adversity between Caraballo and the Estate, and the Estate's counsel has represented to the Ohio court that Caraballo will be dismissed from that action.

## COUNT I
## DECLARATORY RELIEF, 28 U.S.C. § 2201(a)
### Breach Of Contract

59.     PESLIC incorporates all preceding paragraphs as though fully restated herein.

60.     The 2017 Policy and 2019 Policy are contracts of insurance that PESLIC issued to the Diocese.

61.     Caraballo has requested indemnification and other benefits under the Policies as a former employee of Catholic Charities, which is an Additional Named Insured under the Policies.

62.     The Estate has also requested indemnification and other benefits under the Policies as the purported assignee of Caraballo's purported rights and liabilities under the Policies.

63.     The Policies require insureds to obtain consent from PESLIC before offering or agreeing to pay an amount in excess of the $1 million Retained Limit.  *See* 2017 Policy, GL Coverage Part, ¶ B.6; 2019 Policy, WAL Coverage Part, ¶ B.6; 2019 Policy; MPL Coverage Part, ¶ B.6.

64.     The Policies also prohibit insureds from transferring their rights and duties under the Policies without PESLIC's written consent.  *See* 2017 Policy, Policy Conditions, ¶ I.

16

65.     The Policies also require insureds to cooperate with PESLIC, including by requiring insureds to "[p]rovide your full cooperation as stated in this policy."  2017 Policy, Liability Conditions, Definitions, and Exclusions, Condition H.3.

66.     On September 10, 2021, the Estate's counsel wrote the Ohio court presiding over the underlying action and represented that "Defendant Nancy Caraballo and plaintiff have entered a settlement agreement…."  On September 20, 2021, counsel for the Estate once again represented in a letter to PESLIC that it had "reached a settlement with Defendant Nancy Caraballo individually for $36,000,000."  On October 14, 2021, counsel for the Estate represented to PESLIC that it could "easily provide signed copies" of its settlement agreement with Caraballo.

67.     The settlement agreement between Caraballo and the Estate constitutes a material breach of the obligations imposed by the Policies.  This breach has prejudiced PESLIC and its insureds by, among other things, depriving PESLIC of an opportunity to reach a reasonable settlement within policy limits, potentially impairing the rights of other insureds to benefits under the Policies, and impairing PESLIC's subrogation rights.

68.     The agreement between Caraballo and the Estate is the product of collusion. Caraballo has not undertaken any liability in the settlement agreement, but is instead being released from all liability in exchange for striking an unreasonable deal and impermissibly assigning her purported benefits under the Policies.  As a result of this collusion, the settlement agreement also violates Ohio public policy.

69.     Because it constitutes a material breach of the Policies and Ohio public policy, the settlement agreement cannot impose any duties or liabilities on PESLIC pursuant to the Policies. Nonetheless, the Estate has demanded that PESLIC pay $36 million based on nothing more than its collusive settlement with Caraballo.

70.     An actual, present, and justiciable controversy has arisen between PESLIC, on the one hand, and Caraballo and the Estate, on the other, concerning the settlement and the rights and duties provided by the Policies.

71.     PESLIC therefore requests a declaration that the settlement constitutes a material breach of the Policies and Ohio public policy, does not impose on PESLIC any duties or liabilities under the Policies, including any duty of indemnification, and excuses PESLIC from any obligation of further performance under the Policies as to Caraballo.

**COUNT II**
**DECLARATORY RELIEF, 28 U.S.C. § 2201(a)**
**Lack Of Coverage Under The Policies, In The Alternative To Count I**

72.     PESLIC incorporates all preceding paragraphs as though fully restated herein.

73.     The 2017 Policy and 2019 Policy are contracts of insurance that PESLIC issued to the Diocese.

74.     Caraballo has requested indemnification and other benefits under the Policies as a former employee of Catholic Charities, which is an Additional Named Insured under the Policies.

75.     The Estate has also requested indemnification and other benefits under the Policies as the purported assignee of Caraballo's purported rights and liabilities under the Policies.

76.     To the extent the settlement is held not to constitute a material breach of the Policies and Ohio public policy, the settlement is nonetheless not covered under the Policies, and is subject to numerous exclusions.   The facts precluding coverage and establishing the applicability of exclusions include the following:

77.     First, Caraballo has not established that she constitutes an Insured under the Policies, as she has not established that she was "acting within the scope of [her] duties for" Catholic Charities.  2017 Policy, Liability Conditions, Definitions, and Exclusions, Definition 21.b.  Caraballo's admitted criminal scheme with Jordan's mother, which forms the basis of

Caraballo's alleged liability under the SAC, plainly was not within the scope of her duties for Catholic Charities.

78.     Second, Caraballo has not established that she is entitled to coverage under the GL Coverage Part, as she has not established that any Bodily Injury underlying her settlement agreement was "caused by an Occurrence," which is defined to mean, in relevant part, "an accidental happening."  2017 Policy, GL Coverage Part, ¶ A.1.a; 2017 Policy, Liability Conditions, Definitions, and Exclusions, Definition 26.a.  The SAC's allegations against Caraballo show that Jordan's Bodily Injury was not accidental from Caraballo's standpoint.

79.     Third, Caraballo has not established that she is entitled to coverage under the MPL Coverage Part.  Caraballo has not established that the services she provided as an employee of Catholic Charities constitute Professional Services that "may be legally performed only by a person holding a professional license."   2019 Policy, Liability Conditions, Definitions, and Exclusions, Definition 27.   Caraballo also has not established that her services constituted Religious Institution Counseling Services.  *See* 2019 Policy, MPL Coverage Part, Schedule of Professional Services, ¶ 1.   And even if Caraballo could establish that she was providing a Professional Service, that fact would exclude coverage under the GL and WAL Coverage Parts. *See* 2019 Policy, Liability Conditions, Definitions, and Exclusions, Exclusion 4 & Endorsement No. RL 2032D.

80.     Fourth, any coverage is excluded by Exclusion 9, which specifies that:

The insurance under any Liability Coverage Part in this policy does NOT apply to: … Any liability arising out of any criminal, fraudulent, dishonest act, or bad faith of an Insured or arising from the deliberate violation of any federal, state, or local statute, ordinance, rule or regulation committed by or with the knowledge of an Insured.

2017 Policy, Liability Conditions, Definitions, and Exclusions, Exclusion 9.  The SAC alleges that Caraballo's liability arises out of her criminal, fraudulent, dishonest, and bad acts, and from her deliberate violation of state statute.

81.     Fifth, any coverage under the GL or WAL Coverage Parts is excluded by Exclusion 3, which provides that: "The insurance under any Liability Coverage Part does NOT apply to … Any liability arising out of [] The rendering or failure to render … Any service or treatment conducive to health or of a professional nature."  2017 Policy, Liability Conditions, Definitions, and Exclusions, Exclusion 3.  The SAC alleges that Caraballo's liability arises out of the rendering or failure to render precisely these kinds of services.

82.     Sixth, any coverage under the GL Coverage Part is excluded by the GL Expected or Intended Injury Exclusion, which provides that: "The insurance under this Coverage Part in this policy does NOT apply to: … Bodily Injury … either expected or intended from the standpoint of an Insured."  2017 Policy, GL Coverage Part, ¶ E.2.  The SAC's allegations against Caraballo demonstrate that Jordan's Bodily Injury was expected from Caraballo's standpoint.

83.     Seventh, any coverage under the WAL Coverage Part is excluded by the WAL Bodily Injury Exclusion, which provides that: "The insurance under this Coverage Part does NOT apply to … Any Bodily Injury…."  2019 Policy, WAL Coverage Part, ¶ E.9.  The SAC plainly alleges Bodily Injury, and Caraballo's settlement agreement with the Estate is predicated on Bodily Injury.

84.     Eighth, any coverage under the MPL Coverage Part is excluded by the MPL Custodial Care Exclusion, which provides:

> [T]his insurance will not apply to … Liability resulting from the Insured's acceptance and/or undertaking of custodial care or responsibility of any person. This exclusion applies only if you undertake such custodial care or responsibility

at the request, instruction, authorization, or direction of a governmental agency,
authority, board, or officer having such authority or responsibility.

2019 Policy, MPL Coverage Part, Schedule of Professional Services, ¶ 1.c.  The SAC alleges that

Caraballo's liability arises from her acceptance and/or undertaking of custodial care or

responsibility for Jordan.

85.     Ninth, the $36 million settlement agreement entered into between Caraballo and

the Estate is arbitrary and unreasonable because it is not a fair or reasonable approximation of

Caraballo's potential liability or the potential damages.  The $36 million settlement is also arbitrary

and unreasonable because it was not the product of an actual trial on the merits in which liability,

including the liability of other non-parties, could have been determined and in which a fair

assessment of the Estate's damages could have been determined.  Furthermore, the settlement

agreement is a product of collusion between Caraballo and the Estate.

86.     Tenth, any duties of PESLIC under the Policies have not been triggered, as

Caraballo is not obligated to pay the Estate an amount in excess of the $1 million Retained Limit.

Rather, the settlement agreement eliminates any prospect of liability against Caraballo, who is not

obligated to pay any sum to the Estate.

87.     Eleventh, the $36 million that Caraballo and the Estate have demanded that PESLIC

pay is far in excess of the applicable $10 million limits under the PESLIC Policies, which sit in

excess of a $1 million Retained Limit.  Furthermore, only one coverage part can apply to each loss.

*See* 2017 Policy, GL Coverage Part, ¶ E.1; 2019 Policy, WAL Coverage Part, ¶ E.1; 2019 Policy;

MPL Coverage Part, ¶ E.1.

88.     Despite the numerous issues that defeat and exclude coverage, the Estate has

demanded that PESLIC pay $36 million dollars based on nothing more than its collusive settlement

with Caraballo.

21

89.     An actual, present, and justiciable controversy has arisen between PESLIC, on the one hand, and Caraballo and the Estate, on the other, concerning the settlement and the rights and duties provided by the Policies.

90.     PESLIC therefore requests a declaration that the Policies do not provide coverage for the settlement, or that any available coverage is excluded.

**PRAYER FOR RELIEF**

WHEREFORE, PESLIC respectfully requests that the Court enter the following relief:

a.      A judgment declaring that the settlement between Caraballo and the Estate constitutes a material breach of the Policies and Ohio public policy, does not impose on PESLIC any duties or liabilities under the Policies, including any duty of indemnification, and excuses PESLIC from any obligation of further performance under the Policies as to Caraballo;

b.      A judgment declaring that the Policies do not provide coverage for the settlement, or that any available coverage is excluded; and

c.      Such further or other relief that the Court deems just and proper.

**JURY DEMAND**

Pursuant to Fed. R. Civ. P. 38, PESLIC demands a jury trial as to all issues so triable.

Dated: October 19, 2021
      Cleveland, OH

/s/ Crystal L. Maluchnik

Steven G. Janik
Crystal L. Maluchnik
JANIK L.L.P.
9200 South Hills Blvd., Ste. 300
Cleveland, OH 44147
(440) 838-7600
steven.janik@janiklaw.com
crystal.maluchnik@janiklaw.com

Jane M. Byrne (*pro hac vice* forthcoming)
Guyon H. Knight (*pro hac vice* forthcoming)
MCDERMOTT WILL & EMERY LLP
One Vanderbilt Avenue
New York, NY 10017
(212) 547-5400
jbyrne@mwe.com
gknight@mwe.com

*Attorneys for Plaintiff The Princeton Excess and Surplus Lines Insurance Company*