# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| THE PRINCETON EXCESS AND SURPLUS LINES INSURANCE COMPANY, | CASE NO. 1:21-cv-01981 |
| Plaintiff, | JUDGE PAMELA A. BARKER |
| -vs- | |
| NANCY CARABALLO, et al., | MEMORANDUM OPINION AND ORDER |
| Defendants. | |

Currently pending is Defendant Michelle Rodriguez's, as the Administrator of the Estate of Jordan Rodriguez ("the Estate"), Motion to Dismiss Plaintiff's Complaint.  (Doc. No. 26.)  Plaintiff The Princeton Excess and Surplus Lines Insurance Company ("PESLIC") filed an Opposition to the Estate's Motion, to which the Estate replied.  (Doc. Nos. 29, 31.)  For the following reasons, the Estate's Motion is DENIED.

## I.    Background

PESLIC brings this declaratory judgment action against Defendants Nancy Caraballo, the Estate, Catholic Charities Corporation, and the Roman Catholic Diocese of Cleveland, Ohio.

### A.    Underlying State-Court Action

The declaratory judgment action stems from an underlying state-court case involving the September 2017 death of five-year-old Jordan Rodriguez.  (Complaint, Doc. No. 1, ¶ 1.)  In January 2019, the Estate filed suit against Catholic Charities and Caraballo, among others, related to Jordan's death.  (*Id.* at ¶ 19.)

Catholic Charities, a Roman Catholic organization that provides a variety of social services in Northeast Ohio, entered into annual contracts with Educational Service Center of Cuyahoga County ("ESC") on behalf of Bright Beginnings Parents as Teachers from 2013 through 2017.  (*Id.* at ¶ 14.)  As part of its annual contracts with ESC, Catholic Charities agreed to provide certain parenting education services.  (*Id.*)  In July 2013, Catholic Charities hired Caraballo to work as a "Parent Educator."  (*Id.*)  Caraballo was not a licensed social worker and did not hold any other form of professional license.  (*Id.*)

Caraballo was assigned to provide parenting education classes to Jordan's mother, Larissa Rodriguez ("Larissa") under the Parents as Teachers program.  (*Id.* at ¶ 15.)  PESLIC notes in its Complaint that Jordan was never enrolled in the Parents as Teachers program, but instead, was enrolled in a separate Bright Beginnings program that was not administered by Catholic Charities or, by extension, Caraballo.  (*Id.*)

Beginning in July 2015, Caraballo and Larissa hatched a scheme in which Caraballo bought Larissa's Electronic Benefits Transfer ("EBT") card for approximately half of the EBT card's value. (*Id.* at ¶ 16.)  Caraballo used the EBT card to buy food for herself while Larissa used the cash to buy diapers, pay rent and cell phone bills, and fund her boyfriend's prison commissary.  (*Id.*)  Allegedly, Caraballo covered up this criminal scheme by falsifying home visitation reports that she was otherwise required to file to confirm that she had completed visits to Larissa's home and provided her with parenting education services.  (*Id.* at ¶ 17.)

In September 2017, five-year-old Jordan lived in a house on Cleveland's west side with his mother, several siblings, and his mother's boyfriend, Christopher Rodriguez (no relation to Jordan).  (*Id.* at ¶¶ 19-20.)  Jordan had developmental disabilities and could not speak.  (*Id.*)  He suffered from

2

chronic lung disease and congenital kidney abnormalities.  (*Id.*)  On September 21, 2017, Jordan fell unconscious.  (*Id.* at ¶ 20.)  Neither Larissa nor Christopher provided Jordan with any medical attention. (*Id.*)  Jordan died on September 22, 2017.  (*Id.*)  Christopher buried Jordan in the backyard later that day.  (*Id.*)

In December 2017, Jordan's body was discovered, leading to criminal prosecutions against Larissa and Christopher.  (*Id.* at ¶ 21.)  Larissa was also prosecuted for the benefits fraud she perpetrated with Caraballo.  (*Id.*)  Larissa and Christopher eventually pleaded guilty to numerous crimes related to Jordan's death and were each sentenced to more than 20 years in prison.  (*Id.* at ¶ 21.)  On April 2, 2018, Caraballo pleaded guilty to four felonies: trafficking in, or illegal use of, food stamps; grand theft; and two counts of tampering with records.  (*Id.* at ¶ 17.)  Caraballo was sentenced to three years in prison for her role in the benefits fraud scheme.  (*Id.*)

Jordan's Estate filed the state-court action in January 2019.  (*Id.* at ¶ 18.)  In the underlying action, the Estate alleges that Jordan's death was caused by "nutritional and medical neglect," and that this neglect grew directly out of the criminal benefits fraud scheme hatched between Larissa and Caraballo.  (*Id.* at ¶ 22.)  The Estate specifically alleged that Caraballo contributed to and caused Jordan to become malnourished and starve as a result of purchasing Larissa's EBT card.  (*Id.*)  The Estate also alleged that Caraballo, a mandatory reporter of child abuse and neglect and suspected child abuse and neglect, failed to immediately report her knowledge of "reasonable cause to suspect that Jordan suffered or faced the threat of suffering from neglect[,] abuse or injury."  (*Id.* at ¶ 23.)  Based on these allegations, the Estate asserted five causes of action against Caraballo in the underlying state-court action: wrongful death—reckless, willful, and wanton; two counts of wrongful death—negligence; survival action—negligence; and statutory failure to report.  (*Id.* at ¶ 24.)

B.     **The PESLIC Policies**

PESLIC, a domestic surplus lines insurer, issued a Retained Limit Policy, no. N2-A-3-RL-0000008-10 ("2017 Policy") to the Roman Catholic Diocese of Cleveland ("the Diocese").  (*Id.* at ¶¶ 25, 26.)  The 2017 Policy covered the period from January 1, 2017 to January 1, 2018.  (*Id.*)  PESLIC also issued a materially similar Retained Limit Policy, no. N2-A3-RL-0000008-12 ("2019 Policy), to the Diocese (collectively, "the Policies").  (*Id.* at ¶ 26.)  The 2019 Policy covered the period from January 1, 2019 to January 1, 2020.  (*Id.*)  The Policies provided the Diocese with $10 million in aggregate coverage in excess of a $1 million "Retained Limit."  Only one set of limits applies to all claims arising from the same Occurrence, Accidence, or Wrongful Act, even if multiple policies are triggered.  (*Id.* at ¶ 27.)  Coverage under the Policies is available to Insureds, defined to include the Diocese; any organization "owned, controlled, or operated by the" Diocese, and "[a]ll of your current or former employees" "[w]hile acting within the scope of their duties for" the Diocese or its organizations.  (*Id.* at ¶ 28.)  The Policies expressly indicated that PESLIC had "no duty to defend a Claim against an Insured," and imposed only a duty of indemnification on PESLIC.  (*Id.* at ¶ 29.)  PESLIC alleges that Catholic Charities is "an Additional Named Insured" under the Policies.  (*Id.* at ¶ 61.)

Relevant to the instant Motion, the Policies only obligated PESLIC "to indemnify for settlements to which it consented."  (*Id.* at ¶ 40.)  Specifically, "the Policies required that: 'You must obtain our prior written approval before offering or agreeing to pay an amount which is in excess of the Retained Limit in order to settle any Claim under [the applicable] Coverage Part.'"  (*Id.*, quoting 2017 Policy, General Liability Coverage Part, ¶ B.6.)  Additionally, "the Policies provide that: 'Your rights and duties under this insurance may NOT be transferred without our written consent except in

4

the case of death of an individual insured.'"  (*Id.*, quoting 2017 Policy, Policy Conditions, ¶ I.)

Insureds have a duty under the Policies to provide their full cooperation as set forth in the Policies.

(*Id.*)

### C.    Settlement Efforts in the Underlying Lawsuit

PESLIC alleges that it received notice of the underlying action against Catholic Charities and

Caraballo in January 2019.  (*Id.* at ¶ 42.)  PESLIC alleges that it was not given prior notice of Jordan's

death, despite its discovery in December 2017 and Caraballo's guilty plea in April 2018.  (*Id.*)

In September 2020, the Estate made a $33 million settlement demand to Catholic Charities to

resolve the Estate's claims against Catholic Charities alone.  (*Id.* at ¶ 47.)  In December 2020, Catholic

Charities told the Estate that such a demand was premature but that it remained open to mediation.

(*Id.*)  On July 12, 2021, the Estate's counsel informed Catholic Charities' counsel that the Estate was

uninterested in attending a mediation where the PESLIC policies are at issue.  (*Id.* at ¶ 48.)  The Estate

indicated that it needed a formal offer of the Policies' limits, and acknowledgement that the parties

were in the excess coverage limits before proceeding.  (*Id.*)

On August 12, 2021, PESLIC attended a settlement conference in the underlying action.  (*Id.*

at ¶ 49.)  PESLIC consented to a settlement offer of $1 million on behalf of both Caraballo and

Catholic Charities.  (*Id.*)  The Estate lowered its settlement demand from $33 million to $32.5 million.

(*Id.*)

PESLIC alleges that in late August 2021, it learned for the first time that Caraballo was

considering an individual settlement with the Estate.  PESLIC alleges that such a settlement is a

violation of Caraballo's obligations under the Policies.  (*Id.* at ¶ 50.)  On August 30, 2021, the Estate

advised the state trial court that it had reached a "general potential agreement" with Caraballo and

5

that only final details had yet to be worked out.  (*Id.* at ¶ 51.)  Allegedly, the Estate represented to the state court that it and Caraballo intended to resolve the case through "a one-day bench trial without any witnesses being called, and without any adversary proceedings."  (*Id.*)  Allegedly, the Estate and Caraballo intended to submit depositions and joint stipulations and suggest an amount to the court to assist its determination of damages.  (*Id.*)  The Estate promised not to seek to collect judgment against Caraballo individually and that Caraballo would convey an assignment of the declaratory judgment action against the insurers.  (*Id.*)  Further, the Estate and Caraballo agreed that there would be no appeal from the state court's bench trial decision.  (*Id.*)  PESLIC alleges that the "clear purpose of this show trial would be to manufacture coverage under the Policies and avoid findings of facts that would defeat coverage—all without the risk of a contested proceeding where liability and damages would be disputed."  (*Id.*)

On September 3, 2021, PESLIC wrote to Caraballo's counsel and warned her against entering into the settlement agreement described by the Estate.  (*Id.* at ¶ 52.)  PESLIC advised Caraballo that entering into a settlement agreement without PESLIC's consent would violate the Policies.  (*Id.*)  PESLIC alleges that, despite its warning to Caraballo, she "continued to collude with the lawyers for the Estate and breach the Policies."  (*Id.* at ¶ 53.)  On September 8, 2021, the Estate notified the state court that it and Caraballo had reached an agreement to enter into a Consent Judgment.  (*Id.*)  The Consent Judgment included a judgment for $36 million, $3.5 million more than the Estate's July 2021 settlement offer.  (*Id.*)

On September 9, 2021, PESLIC again notified Caraballo that entering into the "collusive" settlement agreement "would breach the PESLIC Policy."  (*Id.* at ¶ 54.)  PESLIC alleges that it nonetheless confirmed that if Caraballo rescinded the proposed consent judgment, PESLIC would

continue to indemnify Caraballo's covered defense costs and any judgment entered against her after an actual trial on the merits.  (*Id.*)

However, on September 10, 2021, the Estate contacted the state court and represented that it and Caraballo had entered a settlement agreement, irrespective of any consent judgment.  (*Id.* at ¶ 55.)  The Estate represented that it intended to file a motion to dismiss Caraballo within a week, although no such motion had been filed by the time PESLIC filed the instant Complaint.[1]  (*Id.*)  On September 20, 2021, the Estate wrote to PESLIC, Catholic Charities, and an excess insurer to reiterate "that the Estate [had] reached a settlement with" Caraballo for $36 million and demanded payment by October 20, 2021.  (*Id.* at ¶ 56.)  On October 14, 2021, PESLIC requested that counsel for the Estate provide a signed copy of the settlement agreement and noted that any such signed agreement constituted a breach of the relevant Policies.  (*Id.*)  According to PESLIC, the Estate indicated that it could "easily" provide signed copies.  (*Id.*)

### D.    Procedural History

Shortly thereafter, on October 19, 2021, PESLIC filed the instant Complaint.  (Doc. No. 1.)  PESLIC's Complaint sets forth two counts, pleaded in the alternative.  In Count 1, Breach of Contract, PESLIC alleges that the "Policies require insureds to obtain consent from PESLIC before offering or agreeing to pay an amount in excess of the $1 million Retained Limit," "prohibit insureds from transferring their rights and duties under the Policies without PESLIC's written consent," and require insureds to cooperate with PESLIC, including by requiring insureds to "'[p]rovide your full cooperation as stated in this policy."  (*Id.* at ¶¶ 63-65.)  PESLIC alleges that the settlement agreement

---

[1] The underlying state court action remains stayed while Catholic Charities seeks to appeal to the Ohio Supreme Court the Eighth District Court of Appeals' affirmance of the state trial court's denial of political subdivision immunity.  (*See* Supreme Court of Ohio Docket 2022-0679, 6/6/2022 Notice of Appeal; *see also* Cuyahoga County Court of Common Pleas Docket CV-19-909566, 9/10/2021 Order.)

"between Caraballo and the Estate constitutes a material breach of the obligations imposed by the Policies" because Caraballo never obtained PESLIC's consent prior to entering into the settlement agreement and because she purported to assign her benefits under the Policies to the Estate.  (*Id.* at ¶¶ 67-68.)  PESLIC further alleges that "the agreement between Caraballo and the Estate is the product of collusion" and that she "has not undertaken any liability in the settlement agreement, but is instead being released from all liability in exchange for striking an unreasonable deal and impermissibly assigning her purported benefits under the Policies." (*Id.* at ¶ 68.)  PESLIC alleges that "as a result of this collusion, the settlement agreement also violates Ohio public policy." (*Id.*) According to PESLIC, because the settlement agreement "constitutes a material breach of the Policies and Ohio public policy, the settlement agreement cannot impose any duties or liabilities on PESLIC pursuant to the Policies." (*Id.* at ¶ 69.)  Nonetheless, according to PESLIC, the Estate has demanded that it "pay $36 million based on nothing more than its collusive settlement with Caraballo." (*Id.*) Accordingly, PESLIC seeks "a declaration that the settlement constitutes a material breach of the Policies and Ohio public policy, does not impose on PESLIC any duties or liabilities under the Policies, including any duty of indemnification, and excuses PESLIC from any obligation of further performance under the Policies as to Caraballo." (*Id.* at ¶ 71.)

PESLIC's Complaint also includes Count II, captioned "DECLARATORY RELIEF, 28 U.S.C. § 2201(a) Lack Of Coverage Under The Policies, In The Alternative to Count 1."  Therein, PESLIC alleges that, "to the extent that the settlement is held not to constitute a material breach of the Policies and Ohio public policy, the settlement is nonetheless not covered under the Policies, and is subject to numerous exclusions." (*Id.* at ¶ 76.)  PESLIC contends that 11 separate exclusions under

various parts of the Policies operate to separately bar coverage, based on the facts in the underlying case.  (*Id.* at ¶¶ 77-87.)

Catholic Charities and the Diocese filed Answers to PESLIC's Complaint on December 3, 2021.  (Doc. Nos. 23, 24.)  Caraballo filed an Answer to PESLIC's Complaint on December 7, 2021.  (Doc. No. 25.)  The Estate filed the instant Motion to Dismiss on December 13, 2021.  (Doc. No. 26.)  PESLIC filed an Opposition to the Estate's Motion on January 12, 2022, to which the Estate replied on February 9, 2022.  (Doc. Nos. 29, 31.)  Thus, the Estate's Motion is now ripe for a decision.

## II.  Standard of Review

The Estate argues that the Court should decline jurisdiction over PESLIC's Complaint pursuant to Fed. R. Civ. P. 12(b)(1).  Fed. R. Civ. P. 12(b)(1) provides for dismissal when a court lacks subject matter jurisdiction.  Without subject matter jurisdiction, a federal court lacks authority to hear a case.  *Thornton v. Sw. Detroit Hosp.*, 895 F.2d 1131, 1133 (6th Cir. 1990).  The standard of review of a 12(b)(1) motion to dismiss for lack of subject matter jurisdiction depends on whether the defendant makes a facial or factual challenge to subject matter jurisdiction.  *Wayside Church v. Van Buren County,* 847 F.3d 812, 816-17 (6th Cir. 2017).  A facial attack "questions merely the sufficiency of the pleading" and requires the district court to "take[] the allegations in the complaint as true."  *Gentek Bldg. Prods., Inc. v. Sherwin-Williams Co.,* 491 F.3d 320, 330 (6th Cir. 2007).  To survive a facial attack, the complaint must contain a short and plain statement of the grounds for jurisdiction.  *See Rote v. Zel Custom Mfg. LLC*, 816 F.3d 383, 387 (6th Cir. 2016); *Ogle v. Ohio Civil Service Employees Ass'n, AFSCME*, Local 11, 397 F. Supp. 3d 1076, 1081-82 (S.D. Ohio 2019).

By contrast, a factual attack "raises a factual controversy requiring the district court 'to weigh the conflicting evidence to arrive at the factual predicate that subject-matter does or does not exist.'"

9

*Wayside Church,* 847 F.3d at 817 (quoting *Gentek Bldg. Prods., Inc.*, 491 F.3d at 330). The plaintiff has the burden of proving jurisdiction when subject matter jurisdiction is challenged. *Rogers v. Stratton Indus.*, 798 F.2d 913, 915 (6th Cir. 1986). The court may allow "affidavits, documents and even a limited evidentiary hearing to resolve disputed jurisdictional facts." *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990).

The Estate urges this Court to exercise its discretion, pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, and decline to exercise jurisdiction over PESLIC's declaratory judgment claims. (Doc. No. 26, PageID# 398.) Under the Declaratory Judgment Act, litigants do not possess an absolute right to bring a lawsuit for declaratory judgment. 28 U.S.C. § 2201. *See also AmSouth Bank v. Dale*, 386 F.3d 763, 784 (6th Cir. 2004) (citing *Wilton v. Seven Falls Co.*, 515 U.S. 277, 282 (1995)). Instead, "[d]istrict courts possess discretion in determining whether and when to entertain an action under the Declaratory Judgment Act, even when the suit otherwise satisfies subject matter jurisdictional prerequisites." *Id.* (quoting *Wilton*, 515 U.S. at 282).

The Sixth Circuit has enunciated a five-factor test (commonly referred to as the "*Grand Trunk* factors") that district courts must utilize to determine if jurisdiction is proper under § 2201:

(1) whether the judgment would settle the controversy;

(2) whether the declaratory judgment action would serve a useful purpose in clarifying the legal relations at issue;

(3) whether the declaratory remedy is being used merely for the purpose of "procedural fencing" or "to provide an arena for a race for res judicata";

(4) whether the use of a declaratory action would increase the friction between our federal and state courts and improperly encroach on state jurisdiction; and

(5) whether there is an alternative remedy that is better or more effective.

*Id.* at 785 (citing *Scottsdale Ins. Co. v. Roumph*, 211 F.3d 964, 968 (6th Cir. 2000)); *see also, e.g., United Specialty Ins. Co. v. Cole's Place, Inc*., 936 F.3d 386, 396 (6th Cir. 2019).  Although the above formulation indicates that courts should balance the five factors, the Sixth Circuit has never indicated the relative weights of the factors. *See United Specialty Ins. Co*., 936 F.3d at 396.  Instead, "[t]he relative weight of the underlying considerations of efficiency, fairness, and federalism will depend on facts of the case."  *W. World Ins. Co. v. Hoey*, 773 F.3d 755, 759 (6th Cir. 2014).  The Sixth Circuit has noted, in weighing these factors, "[d]istrict courts must be afforded substantial discretion to exercise jurisdiction 'in the first instance, because facts bearing on the usefulness of the declaratory judgment remedy, and [the] fitness of the case for resolution, are peculiarly within their grasp.'"  *Flowers*, 513 F.3d at 554 (quoting *Wilton,* 515 U.S. at 289 (1995)).

Where, as here, a district court is presented with a claim that is connected to an underlying state action, the overarching question is "whether the questions in controversy between the parties to the federal suit, and which are not foreclosed under the applicable substantive law, can better be settled in the proceeding pending in the state court."  *Brillhart v. Excess Ins. Co. of America*, 316 U.S. 491, 495 (1942).  Parties may file a Motion to Stay Proceedings at any time during the declaratory judgment action.  *See, e.g., Exxon Corp. v. St. Paul Fire & Marine Ins. Co.*, 129 F.3d 781 (5th Cir. 1997) and *Bituminous Cas. Corp v. J & L Lumber Co.*, 373 F.3d 807 (6th Cir. 2004); *see also, e.g., W. World Ins. Co. Assoc., Inc. v. Amgad William Abdou, M.D.*, No. 1:12-cv-2719, 2013 WL 12131308, at *2 (N.D. Ohio Aug. 7, 2013).

## III.    Analysis

The Estate argues that PESLIC's declaratory judgment action should be dismissed because PESLIC asks this Court to determine precisely what the state court has already held to be a disputed

11

question of fact in the underlying lawsuit: whether Caraballo acted within the scope of her employment. (Doc. No. 26, PageID# 397.) According to the Estate, in the underlying lawsuit, the state court denied four separate motions for summary judgment filed by Catholic Charities and explicitly ruled that "there are material questions of fact as to whether Nancy Caraballo's actions and/or inactions were within the course and scope of her employment with Catholic Charities." (*Id.* at PageID# 396.) The Estate argues that, fundamentally, PESLIC's "declaratory action asks this Court to determine whether or not Caraballo acted within the scope of her employment to cause the death of Jordan Rodri[g]uez." (*Id.* at PageID# 399.) To support its argument, the Estate cites to four paragraphs from PESLIC's Complaint, all from Count 2. (*Id.*, citing Doc. No. 1, ¶¶ 77, 78, 80, 82.)

Indeed, in Count 2 of its Complaint, PESLIC alleges as follows:

First, Caraballo has not established that she constitutes an Insured under the Policies, as she has not established that she was "acting within the scope of [her] duties for" Catholic Charities. 2017 Policy, Liability Conditions, Definitions, and Exclusions, Definition 21.b. Caraballo's admitted criminal scheme with Jordan's mother, which forms the basis of Caraballo's alleged liability under the SAC, plainly was not within the scope of her duties for Catholic Charities.

(Doc. No. 1, ¶ 77.) Likewise, in paragraphs 78, 80, and 82, PESLIC alleges that Caraballo is not entitled to coverage under various Policy provisions because the allegations against Caraballo show that Jordan's bodily injury was not accidental from Caraballo's standpoint, that coverage is excluded because Caraballo's liability arose out of criminal and/or bad acts, and because Jordan's bodily injury was either expected or intended by Caraballo. (*Id.* at ¶¶ 78, 80, 82.)

In its Opposition, PESLIC argues that the Estate erroneously attempts to dismiss the entire declaratory judgment action because one of the eleven separate exclusions raised in PESLIC's alternative Count 2 implicates a question of fact that has yet to be decided in the state court proceeding. (Doc. No. 29, PageID# 506.) PESLIC asserts that the Estate failed to address Count 1

12

altogether and, further, that all five *Grand Trunk* factors support exercising jurisdiction over Count 2. (*Id.* at PageID# 512-14.) Alternatively, PESLIC argues that this Court should stay, not dismiss, Count 2, pending the resolution of the state court action. (*Id.* at PageID# 522.)

### A.    Count 2

The Court will address Count 2 first. PESLIC asserts that this Court could stay Count 2, pending the resolution of the state court action, while also proceeding to consider Count 1. (*Id.*) The Estate agrees with PESLIC that, in the alternative, PESLIC's "suit should be stayed[2], pending the resolution of the state court proceeding." (Doc. No. 31, PageID# 540.)

The Court agrees that the most prudent course of action is to stay Count 2 at this time, rather than decide whether to exercise jurisdiction over the claim. At least one of PESLIC's eleven possible exclusions is premised upon PESLIC's assertion that Caraballo has not established that she acted within the scope of her duties for Catholic Charities. (*See* Doc. No. 1, ¶ 77.) However, the state court expressly ruled that material questions of fact exist whether Caraballo acted within the scope of her duties. (Doc. No. 26, PageID# 396.) Additionally, a handful of PESLIC's other eleven possible exclusions involve facts that are intertwined with the issue of whether Caraballo acted beyond the scope of her duty as a Catholic Charities employee. (Doc. No. 1, ¶¶ 78, 80, 82.) The facts developed during the state trial will likely allow this Court to make determinations about the application of PESLIC's various identified exclusions. For now, the Court agrees with the parties and stays consideration of whether it should exercise jurisdiction over Count 2.[3]  *See, e.g., Wilton*, 515 U.S. at 288 n. 2 ("We note that where the basis for declining to proceed is the pendency of a state proceeding,

---

[2] The Court notes that PESLIC asserted merely that Count 2, not the entire case, should be stayed.

[3] Because the Court will stay Count 2, it does not reach the Estate's argument that the instant action should be dismissed under Fed. R. Civ. P. 12(b)(6) because the issue of whether Caraballo acted within the scope of her employment has already been decided by a state court. (Doc. No. 26, PageID# 407-08.)

a stay will often be the preferable course . . . ."); *Great Divide Ins. Co. v. Bear Mountain Lodge, LLC*, No. 3:15-cv-00189-JWS, 2016 WL 2771115, at *4 (D. Alaska May 12, 2016) (district court stayed its determination as to whether certain exclusions applied so as to preclude coverage in the underlying tort litigation, but proceeded to consider whether a third exclusion applied); *see also, e.g., Abdou*, 2013 WL 12131308 at *3 n.2 (concluding that there was little overlap between the facts at issue in the state and federal court proceedings, but noting that the defendants "may file a Motion to Stay Proceedings at a later date if further conflicting factual findings are discovered.").

### B.    Count 1

The Court will consider only whether it should exercise jurisdiction over Count 1, PESLIC's breach of contract claim.  After weighing each of the *Grand Trunk* factors below, the Court concludes that it will exercise jurisdiction over Count 1.

#### 1.    Whether the Judgment Would Settle the Controversy

The instant declaratory judgment action is a controversy over insurance coverage.  In the context of determining whether an insurance provider can have the scope of its coverage decided in federal court during a pending state court action, the Sixth Circuit has observed that "[t]wo lines of precedent seem to have developed jurisprudence regarding consideration of this first factor . . . ." *Flowers*, 513 F.3d at 555.

In one line of cases, the Sixth Circuit has found that the declaratory judgment action must settle the ultimate state court action, not only the insurance coverage dispute before the federal district court.  *See, e.g., Bituminous*, 373 F.3d at 814 (finding that exercising jurisdiction over a declaratory judgment action is inappropriate when it would not settle the underlying controversy but would instead complicate it due to competing factual findings); *Travelers Indem. Co. v. Bowling Green*

*Prof'l Assoc., PLC*, 495 F.3d 266, 272 (6th Cir. 2008) (concluding that the district court's decision could not settle the controversy in the underlying state court litigation and, thus, the first factor favored not exercising jurisdiction).

However, in the other line of cases, the Sixth Circuit "has concluded that a declaratory relief action can settle the insurance coverage controversy not being addressed in state court, even though it will not help resolve the underlying state court action." *Flowers*, 513 F.3d at 556. See also *West Am. Ins. Co. v. Prewitt*, 208 F. App'x 393, 396 (6th Cir. 2006) (affirming the district court's decision to exercise jurisdiction over the insurance coverage dispute, even though the state court tort action focused on alleged negligence in the operation of a sailboat); *Northland Ins. Co. v. Stewart Title Guar. Co.*, 327 F.3d 448, 454 (6th Cir. 2003) (explaining that while a declaratory judgment would not settle the controversy between the state parties, it would settle the insurance coverage between Northland and the insured).

The Sixth Circuit in *Flowers* "did not explicitly resolve or reconcile the competing lines of precedent, noting only that the differing views may be explained by 'competing policy considerations of consolidating litigation into one court versus permitting a party to determine its legal obligations as quickly as possible' and 'different factual scenarios.'" *Assurance Co. of Am. v. Continental Dev. & Constr., Inc.*, No. 3:08-cv-0711, 2009 WL 1616760, at *5 (M.D. Tenn. June 8, 2009) (quoting *Flowers*, 515 F.3d at 555). In the first line of cases, the declaratory judgment involves legal or factual questions that overlap or conflict with the underlying state court action and, in those cases, exercise of jurisdiction is inappropriate because the federal court would be unable to settle the underlying controversy. *See Bituminous*, 373 F.3d at 813-14 (concluding that a federal declaratory judgment action would serve no useful purpose because the only issue before the federal court was a factual

15

dispute that had been twice presented to state courts). Conversely, in the second line of cases, the declaratory judgment involves legal questions or facts that do not conflict with the underlying state court action and, therefore, exercise of jurisdiction is appropriate. *Flowers*, 515 F.3d at 556.

The Court concludes that this factor weighs in favor of exercising jurisdiction over Count 1. This case falls into the second line of cases. Based on PESLIC's allegations in Count 1, there is little overlap between the state and federal actions. In Count 1, as in *Flowers*, the only controversy between PESLIC and the Estate is whether the settlement agreement between Caraballo and the Estate constitutes a material breach of Caraballo's obligations under the Policies, therefore relieving PESLIC from any duty to pay the settlement amount to the Estate. (Doc. No. 1, ¶ 67.) Whether Caraballo's settlement agreement constitutes a material breach of the Policies, and thus absolves PESLIC of the obligation to pay the settlement amount to the Estate, is a legal question that can be decided without answering any questions about Caraballo's tort liability for the events surrounding Jordan's death in the underlying state court action.

Moreover, Count 1 differs from the *Bituminous*, and the first line of cases generally, in two additional ways. First, unlike the declaratory plaintiff in *Bituminous*, PESLIC is not a party to the underlying state court action. *Bituminous*, 373 F.3d at 813-14. Second, in *Bituminous*, the same parties from the state court action raised the exact same issue that had been raised—and determined—in state court: whether Shields was an employee for the sake of determining insurance coverage. *Id.* As discussed above, however, the only issue in this case is a legal question of insurance coverage, not a question of fact identical to one before the state court. As such, a ruling by this Court will settle the insurance coverage controversy and, hence, this factor strongly favors the Court's exercise of jurisdiction over Count 1.

16

### 2. Whether the Declaratory Judgment Action Would Serve a Useful Purpose in Clarifying the Legal Relations at Issue

Analysis of the second factor is closely tied to the first. *Flowers*, 513 F.3d at 557. As with the first factor, two diverging lines of precedent have developed in the Sixth Circuit over whether the declaratory judgment need only clarify the relationships between the parties to the federal action, or the legal relationships in the underlying state action as well. *Compare United Specialty Ins. Co.*, 936 F.3d at 397 (observing that the Sixth Circuit's "most recent decisions have held that district courts did not abuse their discretion in concluding that a declaratory judgment would settle the controversy by resolving the issue of indemnity") *with Bituminous*, 373 F.3d at 814 (holding that although the declaratory judgment would clarify legal relationships between the parties in the declaratory action, it would not clarify legal relationships between the plaintiff and defendant in the underlying state action and therefore exercising jurisdiction was inappropriate).

As explained above, the instant declaratory judgment action will settle the controversy as to Count 1 between PESLIC and the Estate. The second factors involves asking or evaluating whether the relationships between the parties in the declaratory judgment, here insurer and potential recipient of a settlement under the insurance policies, will be clarified. *See Northland*, 327 F.3d at 454; *Flowers*, 513 F.3d at 557. The answer here is yes: a declaratory judgment construing the Policies will establish the extent of PESLIC's obligations, if any, to Caraballo and the Estate after Caraballo allegedly breached her duties under the Policies and entered into an allegedly collusive settlement agreement. Thus, the relations between PESLIC, Caraballo, and the Estate will be clarified as to PESLIC's obligation to pay the Estate $36 million. The second factor also weighs strongly in favor of exercising jurisdiction.

17

### 3. Whether the Declaratory Judgment Action is Motivated by "Procedural Fencing"

"'Procedural fencing' refers to 'a range of tactics that courts regard as unfair or unseemly,' including selecting a forum to start a race for res judicata." *Cardinal Health, Inc. v. Nat'l Union Fire Ins. Co.*, 29 F.4th 792, 797 (6th Cir. 2022) (quoting *Western World Ins. Co. v. Hoey*, 773 F.3d 755, 761 (6th Cir. 2014)). This factor "is meant to preclude jurisdiction for 'declaratory plaintiffs who file their suits mere days or weeks before the coercive suits filed by a 'natural plaintiff' and who seem to have done so for the purpose of acquiring a favorable forum.'" *Flowers*, 513 F.3d at 558 (quoting *AmSouth Bank*, 386 F.3d at 788). The important question is "whether the declaratory plaintiff has filed in an attempt to get her choice of forum by filing first." *AmSouth Bank*, 386 F.3d at 789. The Sixth Circuit has been hesitant to assign the plaintiff with an "improper motive . . . where there is no evidence of such in the record." *Flowers*, 513 F.3d at 558. Additionally, when the declaratory judgment action is filed after the state court action, the plaintiff generally receives the benefit of the doubt that no improper motive exists. *Bituminous*, 373 F.3d at 814.

Here, there is no evidence that PESLIC raced to the courthouse to attain a more favorable decision. To the contrary, the underlying state court litigation was filed two-and-a-half years before the instant action was filed. (*See* Doc. No. 1, ¶ 18.) Further, the Estate's attempt to argue that PESLIC was forum shopping because PESLIC waited to file the instant action until after the state court ruled that a jury must determine whether Caraballo acted within the scope of her employment is unpersuasive. (Doc. No. 26, PageID# 403.) It is irrelevant to the resolution of Count 1 whether Caraballo acted within the scope of her employment. The Estate proffers no other evidence that PESLIC raced to the courthouse to obtain jurisdiction or otherwise had an improper motive in seeking a declaratory judgment. Without any such showing, the Court will not infer "procedural fencing" on

18

PESLIC's part. Accordingly, the third factor is neutral. *See Cardinal Health*, 29 F.4th at 797 (in cases with no evidence of procedural fencing, the Sixth Circuit often finds the third factor to be neutral).

### 4. Whether the Use of a Declaratory Action Would Increase Friction Between Federal and State Courts and Improperly Encroach on State Jurisdiction

The Sixth Circuit has divided this factor into three sub-factors: (1) whether the underlying factual issues are important to an informed resolution of the case; (2) whether the state trial court is in a better position to evaluate those factual issues than is the federal court; and (3) whether there is a close nexus between underlying factual and legal issues and state law and/or public policy, or whether federal common or statutory law dictates a resolution of the declaratory judgment action. *Flowers*, 513 F.3d at 560. The first sub-factor "focuses on whether the state court's resolution of the factual issues in the case is necessary for the district court's resolution of the declaratory judgment action." *Id.* The second sub-factor asks "which court, federal or state, is in a better position to resolve the issues in the declaratory action." *Id.* This factor weighs against an exercise of jurisdiction when there are "novel questions of state law." *Id.* The third sub-factor "focuses on whether the issue in the federal action implicates important state policies and is, thus, more appropriately considered in state court." *Id.* In cases of insurance contract interpretation, the Sixth Circuit has previously held that such issues are "'questions of state law with which the . . . state courts are more familiar and, therefore, better able to resolve.'" *Id.* (quoting *Travelers*, 495 F.3d at 273). However, the Sixth Circuit has also noted that "not all issues of insurance contract interpretation implicate such fundamental state policies that federal courts are unfit to consider them." *Id.* (citing *Northland*, 327 F.3d at 454 (finding that, while the declaratory judgment action seeking a determination of the

policy's scope was governed by state law, "no state law or policy would be frustrated by the district court's exercise of jurisdiction, which would require the application of [state] law")).

First, at this stage, the underlying factual issues are not important to the resolution of Count 1, which focuses solely on Caraballo's conduct in entering into the allegedly collusive settlement agreement.  PESLIC simply asks the Court to interpret the Policies and determine whether they exclude coverage for Caraballo's settlement agreement with the Estate.  (Doc. No. 1, ¶¶ 59-71.)  The Sixth Circuit has held that a district court is "fully capable of determining the nature of the coverage provided by the contract of insurance, and this determination d[oes] not have to await the resolution of factual issues in the state action." *Northland*, 327 F.3d at 454.  There is no overlap between the facts at issue in the state action and those at issue in Count 1 here.  Thus, the underlying factual issues are not important in deciding the declaratory judgment, and this sub-factor weighs in favor of exercising jurisdiction.

The second sub-factor "focuses on which court, federal or state, is in a better position to resolve the issues in the declaratory action." *Flowers*, 513 F.3d at 560.  In *Flowers*, the Sixth Circuit indicated that consideration of this factor usually involves the question of whether novel issues of state law are raised in the declaratory action. *Id.*  Here, no novel issues of state law are raised in Count 1.  Though this Court is asked "to consider questions of state law to resolve the instant case, federal courts routinely apply principles of Ohio law to construe and interpret contracts in diversity cases." *Parker Hannifin Corp. v. Standard Motor Prods., Inc.*, No. 1:19-cv-00617, 2019 WL 5425242, at *33 (N.D. Ohio Oct. 23, 2019).  Thus, the Court concludes that the second sub-factor weighs slightly in favor of exercising jurisdiction.  *See id.* (concluding same).

The third sub-factor "focuses on whether the issue in the federal action implicates important state policies and is, thus, more appropriately considered in state court." *Flowers*, 513 F.3d at 561. The resolution of this declaratory judgment action is not mandated by federal common or statutory law.  Rather, "[s]tates regulate insurance companies for the protection of their residents, and state courts are best situated to identify and enforce the public policies that form the foundation of such a regulation," *Bituminous*, 373 F.3d at 815 (quoting *Allstate Ins. Co. v. Mercier*, 913 F.2d 273, 279 (6th Cir. 1990)).  Therefore, there is a close nexus between the legal issues and state public policy. *See, e.g., Abdou*, 2013 WL 12131308 at *6.  Thus, the third sub-factor weighs slightly against exercising jurisdiction.

In sum, the first and second sub-factors weigh in favor of exercising jurisdiction and the third sub-factor weighs slightly against exercising jurisdiction.  After weighing the three sub-factors against each other, the Court finds that the fourth factor weighs slightly in favor of exercising jurisdiction.

### 5.  Whether an Alternative Remedy is Better or More Effective

The final factor asks whether there are any alternative and better remedies available to PESLIC.  The Sixth Circuit has indicated that a district court should "deny declaratory relief if an alternative remedy is better or more effective." *Grand Trunk*, 746 F.2d at 326.  A state declaratory judgment action and an indemnity action after the end of the state claim are both alternative remedies to a federal declaratory judgment action.  *See Bituminous*, 373 F.3d at 816; *Travelers*, 495 F.3d at 273.  However, an alternative remedy is not necessarily a better remedy. *Flowers*, 513 F.3d at 562 ("[I]t is not clear whether such alternative remedies are better or more effective than a federal declaratory action.").  Further, if the alternative method requires waiting until the state issue is

21

resolved before determining the insurer's obligations, "such a delayed alternative would be worse, not better, than seeking a federal declaratory judgment." *Flowers*, 513 F.3d at 562.

The Court concludes that this factor weighs in favor of exercising jurisdiction.  PESLIC chose "for reasons of its own to have its dispute settled in federal court rather than state court."  *Northland*, 327 F.3d at 454.  Though PESLIC could have chosen to settle the dispute in state court, it is unclear that such an alternative is better or more effective.  Indeed, the Estate indicated that it "would still object to any filed state declaratory relief . . . ." (Doc. No. 26, PageID# 406.)  Additionally, a "delayed alternative," as the Sixth Circuit described in *Flowers*, would indeed be a worse alternative because it could prolong the disputes between the various parties in the underlying litigation.  According to the Complaint, the Estate intends to dismiss its claims against Caraballo based on their settlement agreement.  (Doc. No. 1, ¶ 55.)  It is a better use of judicial economy to determine sooner, rather than later, whether Caraballo's and the Estate's allegedly collusive settlement agreement imposes any duties or liabilities on PESLIC under the Policies before the Estate proceeds to trial against Catholic Charities only.

For all the reasons set forth above, the Court finds that, on balance, the *Grand Trunk* factors support exercising jurisdiction over PESLIC's Count 1.

**IV.** **Conclusion**

For the reasons set forth above, Defendant's Motion to Dismiss is DENIED.  The Court will exercise jurisdiction over Count 1 of PESLIC's Complaint and stay consideration over Count 2, pending resolution of the underlying state court proceedings.

**IT IS SO ORDERED.**

_s/Pamela A. Barker_
PAMELA A. BARKER
Date:  June 28, 2022                          U. S. DISTRICT JUDGE

23