## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| **The Princeton Excess and Surplus Lines Insurance Co.,** | **Case No. 1:21CV1981** |
| **Plaintiff,** | |
| **-vs-** | **JUDGE PAMELA A. BARKER** |
| **Nancy Caraballo, et al.,** | **MEMORANDUM OPINION AND ORDER** |
| **Defendants** | |

Currently pending is Plaintiff The Princeton Excess and Surplus Lines Insurance Company's ("PESLIC") Motion for Summary Judgment, filed December 15, 2023. (Doc. No. 110.) Defendant Michelle Rodriguez, as the Administrator of the Estate of Jordan Rodriguez ("the Estate") filed a Brief in Opposition on January 29, 2024, to which PESLIC replied on February 19, 2024. (Doc. Nos. 112, 113.) Also pending is PESLIC's Motion to Exclude the Report and Testimony of Judge William Taylor. (Doc. No. 114.) The Estate filed a Brief in Opposition to PESLIC's Motion to Exclude on March 4, 2024, to which PESLIC replied on March 11, 2024. (Doc. Nos. 116, 117.)

For the following reasons, PESLIC's Motion to Exclude the Report and Testimony of Judge William Taylor (Doc. No. 114) and Motion for Summary Judgment (Doc. No. 110) are both GRANTED.

## I. Factual Background

### A. Factual Allegations in the Underlying State-Court Action[1]

---

[1] In setting forth the factual allegations in in the underlying state court action, both parties rely, in their summary judgment briefing, on the allegations in the Second Amended Complaint filed by the Estate in that state court action. *See* Doc. No. 110 at pp. 3-4, fn 2; Doc. No. 112 at p. 2. Thus, and for purposes of resolving the instant Motions only, this Court will do the same.

This declaratory judgment action stems from a state court case involving the September 2017 death of five-year-old Jordan Rodriguez.  Jordan Rodriguez was born in November 2012 to Larissa Rodriguez (hereinafter "Larissa").  (Doc. No. 1-2 at ¶ 19.) [2]  He resided with his mother in Cleveland, along with his siblings and his mother's boyfriend, Christopher Rodriguez.  (*Id*. at ¶ 21.)  Jordan suffered from a developmental disability, as well as from chronic lung disease and congenital abnormality of the kidneys.  (*Id*. at ¶ 20.)  He was considered medically fragile and, due to the nature of his disabilities, needed extensive feeding support, various therapies, regular medical consults, and close supervision.  (*Id*.)

At all relevant times, Catholic Charities employed social workers, case managers, case workers, teachers, therapists, and educators to provide social services in Northeast Ohio, including parent coaching, educational services, services for individuals with developmental disabilities, counseling services, and evaluations and services for at-risk Ohio families.  (*Id*. at ¶ 11.)  In July 2013, Catholic Charities hired Nancy Caraballo to work as a "Parent Educator." (*Id*. at ¶ 23.)  Caraballo was responsible for visiting the Rodriguez home on a semi-monthly basis to provide services to Jordan and his family between 2013 and 2017.  (*Id*.)

Beginning in 2015, Caraballo and Larissa had an arrangement whereby Larissa would leave several hundred dollars on her Electronic Benefits Card (hereinafter "EBT Card") each month.  (*Id*. at ¶¶ 30, 31.)  Caraballo would then pay Larissa a lower value, "cents for each dollar remaining on

---

[2] In support of its Motion for Summary Judgment, PESLIC attaches a copy of the Estate's Second Amended Complaint that is marked with a filing date of September 17, 2020.  (Doc. No. 110-5.) The state court docket reflects that the Estate filed a Motion for Leave to File Second Amended Complaint on that date, with its proposed Second Amended Complaint attached as an Exhibit. The state court granted the Estate's Motion for Leave on September 25, 2020, and the Estate thereafter filed its Second Amended Complaint on the docket on October 7, 2020. *See* State Court Action, (docket).  For purposes of resolving the instant Motions, the Court will cite to the Second Amended Complaint that was filed on October 7, 2020 in the state court action, a copy of which is attached as an Exhibit to PESLIC's Complaint.  (Doc. No. 1-2.)

the EBT card, thereby depriving the Rodriguez family of food and nutrition." (*Id*. at ¶ 31.) Between the autumn of 2016 through September 2017, Caraballo allegedly met Larissa multiple times specifically to retrieve the EBT card and failed or refused to provide any or sufficient services to Jordan and his family as mandated by statute and contract during these visits. (*Id*. at ¶ 33.)

At some point in 2016 or 2017, Larissa and Christopher began to inflict repeated abuse against Jordan, including fracturing several of his ribs in the summer of 2017. (*Id*. at ¶¶ 24, 28, 37-38.) Jordan also suffered from nutritional neglect and malnourishment. (*Id*. at ¶¶ 29, 38.) On or about September 21, 2017, Jordan became unconscious and non-responsive in his home. (*Id*. at ¶ 39.) Neither Larissa nor Christopher called emergency services or sought medical attention. (*Id.*) Jordan died on or about September 22, 2017. (*Id.*) Christopher buried Jordan's body in the backyard of their home, in an unmarked and concealed grave, the following day. (*Id*. at ¶ 40.)

Jordan's body was discovered in December 2017. (*Id*. at ¶ 41.) Criminal charges were filed against Larissa and Christopher, both of whom ultimately plead guilty to involuntary manslaughter, felonious assault, and endangering children. (*Id*. at ¶¶ 42, 44.) In addition, Caraballo was prosecuted for the benefits fraud she perpetrated with Larissa. (*Id*. at ¶ 43.) Caraballo plead guilty to: (1) trafficking in or illegal use of food stamps in violation of O.R.C. § 2913.46(B) a third-degree felony; (2) grand theft in violation of O.R.C. 2913.02(A)(2) a fourth-degree felony; and (3) two counts of tampering with government records in violation of O.R.C.§2913.42(A)(1) a third-degree felony. (*Id*.)

## B.     The 2017and 2019 PESLIC Policies

PESLIC, a domestic surplus lines insurer, issued a Retained Limit Policy, No. N2-A3-RL-0000008-10 ("2017 Policy") to the Roman Catholic Diocese of Cleveland ("the Diocese"). (Doc. No. 110-2.) The 2017 Policy covers the period from January 1, 2017 to January 1, 2018. (*Id*. at

PageID# 1678.) PESLIC also issued a materially similar Retained Limit Policy, No. N2-A3-RL-0000008-12 ("2019 Policy), to the Diocese (collectively, "the Policies"). (Doc. No. 110-3.)  The 2019 Policy covers the period from January 1, 2019 to January 1, 2020.  (*Id*. at PageID#1782.)

The Policies provide the Diocese with $10 million in aggregate coverage in excess of a $1 million "Retained Limit."[3]  (Doc. No. 110-2 at PageID# 1683; Doc. No. 110-3 at PageID# 1787.)  The Policies are clear that they "will NOT apply until [the Insured is] obligated to pay the amount of the Retained Limit covered under this policy."  (Doc. No. 110-2 at PageID# 1689; Doc. No. 110-3 at PageID# 1793.)

Coverage under the Policies is available to Insureds, defined to include the Diocese; any organization "owned, controlled, or operated by the" Diocese; and "[a]ll of your current or former employees" "[w]hile acting within the scope of their duties for" the Diocese or its organizations. (Doc. No. 110-2 at PageID# 1696, 1853; Doc. No. 110-3 at PageID# 1798-1799, 1856.)  The Policies expressly indicate that PESLIC has "no duty to defend a Claim against an Insured," and impose only a duty of indemnification on PESLIC.  (Doc. No. 110-2 at PageID# 1713; Doc. No. 110-3 at PageID# 1815.)  It is undisputed that Catholic Charities qualifies as an Insured under the Policies because of its relationship with the Diocese.  *See* Doc. No. 110 at p. 2.

---

[3] The term "Retained Limit" is defined in the Policies as follows: "The applicable amounts shown in the Declarations or any applicable endorsement for Retained Limit that you must pay for Ultimate Net Loss to which this policy would apply except for the amount of the Retained Limit. Such amounts are not indemnified by us and unless otherwise specified are paid by you before we indemnify you for any remaining amounts of Ultimate Net Loss, subject to the applicable Excess Limit Of Insurance shown on the Declarations. The Retained Limit shall not be impaired by any Ultimate Net Loss which is not covered under the applicable Coverage Part." (Doc. No. 110-2 at PageID# 1701; Doc. No. 110-3 at PageID# 1802.) The term "Ultimate Net Loss" means: "The sums for damages for which an Insured is legally liable by reason of a judgment, or an arbitration award entered as a judgment, or a settlement executed by you and the claimant, and shall include defense costs, arising out of an Accident, Occurrence or Wrongful Act. ***." (Doc. No. 110-2 at PageID# 1703; Doc. No. 110-3 at PageID# 1804.)

4

Of particular relevance to the instant action, the Policies specify that the Insured is responsible for the settlement of any claims.  (Doc. No. 110-2 at PageID# 1691; Doc. No. 110-3 at PageID# 1795.)  The Policies further provide that PESLIC is only obligated to indemnify for settlements to which it consented. (Doc. No. 110-2 at PageID# 1713; Doc. No. 110-3 at PageID# 1815.) Specifically, the Policies require that an Insured "must obtain our prior written approval before offering or agreeing to pay an amount which is in excess of the Retained Limit in order to settle any Claim under [the applicable] Coverage Part.'"  (*Id*.)  Additionally, the Policies provide that: "Your rights and duties under this insurance may NOT be transferred without our written consent except in the case of death of an individual insured."  (Doc. No. 110-2 at PageID# 1687; Doc. No. 110-3 at PageID# 1791.)  Insureds have a duty under the Policies to provide their full cooperation as set forth in the Policies.  (Doc. No. 110-2 at PageID# 1690; Doc. No. 110-3 at PageID# 1794.)

### C.      Procedural History and Settlement Discussions in the Underlying State Court Action

On January 15, 2019, Jordan's Estate filed a Complaint in the Cuyahoga County Court of Common Pleas against several defendants, including Catholic Charities, Catholic Charities Diocese of Cleveland, and Nancy Caraballo.  *See Rodriguez v. Catholic Charities, Cuyahoga County Court of Common Pleas* Case No. CV 19 909566 (hereinafter "State Court Action").  The Estate subsequently filed a Second Amended Complaint on October 7, 2020, also naming Catholic Charities, the Diocese, and Caraballo as defendants.  (Doc. No. 1-2.)

In its Second Amended Complaint, the Estate alleged that Jordan's death was caused by "nutritional and medical neglect," and that this neglect grew directly out of the criminal benefits fraud scheme between Larissa and Caraballo.  (*Id*. at ¶¶ 31-33, 39, 57, 58, 68.)  The Estate specifically alleged that Caraballo contributed to and caused Jordan to become malnourished and starve as a result

5

of purchasing Larissa's EBT card. (*Id*.) The Estate also alleged that Caraballo, a mandatory reporter of child abuse and neglect and suspected child abuse and neglect, failed to immediately report her knowledge of reasonable cause to suspect that Jordan suffered or faced the threat of suffering from neglect, abuse or injury. (*Id*. at ¶¶ 54, 56, 58, 68.) Based on these and other allegations, the Estate asserted five causes of action against Caraballo: (1) Wrongful Death—Reckless, Willful, and Wanton (Count I); (2) two counts of Wrongful Death—Negligence (Counts II and IV); (3) Survival Action—Negligence (Count V); and (4) Statutory Failure to Report (Count VI). (Doc. No. 1-2.)

At all relevant times, Attorney Steven Forbes represented Caraballo in the State Court Action. (Forbes Depo. (Doc. No. 119-1) at Tr. 13-14.) It is undisputed that Catholic Charities retained Attorney Forbes to represent Caraballo and, further, that Catholic Charities paid Forbes' attorney fees. (Forbes Depo. at Tr. 14; Bonanni Depo. (Doc. No. 120) at Tr. 19, 114-115.) PESLIC did not play a role in retaining Attorney Forbes to represent Caraballo in the State Court Action. (*Id*.) Catholic Charities was represented by separate counsel, including Attorney Beth Sebaugh. *See* State Court Action, Docket.

On June 28, 2019, PESLIC (through its claims administrator Munich Reinsurance America, Inc. or "Munich RE") sent a letter to Attorney Forbes regarding the State Court Action. (Doc. No. 110-4.) This letter references the 2017 and 2019 Policies and is entitled "Partial Disclaimer and Reservation of Rights." (*Id*.) Therein, PESLIC wrote, in relevant part, as follows:

> **The PESLIC Policies provide indemnity-only coverage on an excess basis**. [The Policies] provide[] that **PESLIC has no duty to defend a Claim against an Insured** seeking damages for Bodily Injury, Personal Injury, Advertising Injury, Property Damage, or Wrongful Acts. Instead, pursuant to the PESLIC Policies, the Insured has the duty to defend any such Claim. However, PESLIC shall have the right under the PESLIC Policies to associate with the Insured in the defense of any Claim and to settle any Claim that, in PESLIC's opinion, may create indemnification obligations for

6

PESLIC.  PESLIC is not exercising its right to participate in the defense of the Lawsuit at this time but reserves the right to do so at a later date.

Not only does the insured have the duty to defend any Claim but, moreover, the Insured shall be responsible for Ultimate Net Loss up to the Retained Limit ($1 million). *** Thus, PESLIC's indemnity obligation under the PESLIC Policies does not attach unless and until the applicable Retained Limit has been exhausted by payment of Ultimate Net Loss to which the PESLIC Policies apply.  ***

That said, Section H.3 of the Liability Conditions, Definitions, and Exclusions section of the Policies provides that the Insured must fully cooperate with PESLIC in its investigation of any Claim. As PESLIC's investigation of the Lawsuit and relevant insurance coverage issues is ongoing, PESLIC reserves all rights in this regard.  ***

**We further note that Section B. (Defense and Indemnification) of the [General Liability], [Wrongful Act Liability], and [Miscellaneous Professional Liability] Coverage Parts further provides that the Insured must obtain PESLIC's prior consent before offering or agreeing to pay an amount which is in excess of the Retained Limit in order to settle any Claim.  PESLIC reserves its rights under the PESLIC Policies' consent provisions and asks that you keep PESLIC apprised of any settlement discussions between the parties.**

(*Id*. at PageID#s 1894-1895) (emphasis added).  After analyzing various potential coverage issues and exclusions, PESLIC again reiterated that it "has no duty to defend Caraballo in the Lawsuit and has no other obligation to respond to the Lawsuit at this time in light of the indemnity-only nature of the PESLIC policies." (*Id*. at PageID# 1900.)

Meanwhile, discovery progressed in the State Court Action.  Attorney Forbes testified that, to the extent it was in Caraballo's best interest, he worked "collaboratively" with counsel for Catholic Charities.  (Forbes Depo. at Tr. 41.)  For example, Attorney Forbes explained that it was Catholic Charities' counsel, Attorney Sebaugh, who "took the lead" on discovery matters, including taking depositions.  (*Id*. at Tr. 135.) Attorney Forbes further testified that Attorney Sebaugh identified expert witnesses to be jointly used by Catholic Charities and Caraballo, and that it was Attorney Sebaugh who was principally involved in working with those experts.  (*Id*. at Tr. 137-138.)

7

That being said, Attorney Forbes repeatedly emphasized that "Caraballo was the decision maker with regard to her case with [his] guidance" and that there were no other "decision makers" with regard to her defense.  (*Id*. at Tr. 16.)  He testified that neither Catholic Charities nor PESLIC controlled his conduct at any of the depositions in the State Court Action and that he was free to ask (and often did ask) questions at those depositions that he felt were appropriate.  (*Id*. at Tr. 18-20.) Attorney Forbes explained that his sole concern was representing Caraballo's best interests and that, if there was a situation where Catholic Charities and/or PESLIC had a certain interest and Caraballo had a different interest, "the only interests [he] was concerned with were Ms. Caraballo's."  (*Id*. at Tr. 15-16.)

 On June 5, 2020, the state court set a Final Pretrial for August 12, 2021 and Jury Trial for September 13, 2021.  *See* State Court Action (docket).  The state court ordered that "parties and any representatives must be present [at the Final Pretrial] with full settlement authority."  (*Id*.)

In December 2020, PESLIC's claims administrator, Raymond Bonanni, had a "trial strategy" call with Catholic Charities' counsel, including Attorney Sebaugh.  (Bonanni Depo. at Tr. 52-54.) Mr. Bonanni wanted to bring in Attorney John Patton to assist as Catholic Charities' trial counsel because of Attorney Patton's previous experience litigating against counsel for the Estate, Attorney Jay Paul Deratany.  (*Id*. at Tr. 53, 55, 58-61.)  The state court docket reflects that, on February 3, 2021, Attorney Patton filed a Motion to Appear *Pro Hac Vice* on behalf of Catholic Charities, which the state trial court granted on February 19, 2021.  *See* State Court Action (docket).  Mr. Bonanni testified that PESLIC retained Attorney Patton to represent Catholic Charities -- *not* Caraballo. (Bonanni Depo. at Tr. 113-114.)  PESLIC paid Attorney Patton's attorney fees.  (*Id*. at Tr. 114.)

8

In March 2021, Catholic Charities filed four motions for summary judgment.  *See* State Court Action (docket).  In one of these motions, Catholic Charities argued that it was entitled to political subdivision immunity with respect to all the Estate's claims against it.  (*Id*.)  In another, Catholic Charities argued that it was not liable for Caraballo's conduct with respect to the Rodriguez family because Caraballo acted outside the scope of her employment at all relevant times.  (*Id*.)  The docket reflects that Caraballo (through Attorney Forbes) filed a brief opposing Catholic Charities' "scope of employment" summary judgment motion.  (*Id*.)  Attorney Forbes testified that neither Catholic Charities nor PESLIC tried to prevent him from opposing Catholic Charities' motion.  (Forbes Depo. at Tr. 21-22.)

On July 30, 2021, PESLIC (through Mr. Bonanni) sent a Supplemental Reservation of Rights letter to Attorney Forbes.  (Doc. No. 110-7.)  Therein, Mr. Bonanni stated that "PESLIC has now been informed that the Retained Limit has been exhausted by payment of attorneys' fees and other litigation costs."  (*Id*. at PageID# 1974.)  He further wrote that "[t]he purpose of this communication is to supplement PESLIC's coverage position and advise Caraballo of additional reasons there may be no coverage for the claims asserted in the lawsuit."  (*Id*.)  After discussing those reasons, Mr. Bonanni concluded by stating:

> General Condition H.3. provides that the Insureds must fully cooperate with PESLIC. Each liability coverage part provides that the Insureds must obtain PESLIC's prior written consent before offering or agreeing to pay an amount in excess of the Retained Limit in order to settle any Claim. PESLIC reserves all rights under the cooperation and consent provisions and asks that Caraballo keep PESLIC apprised as to the status of the lawsuit, including, but not limited to, any significant developments and any settlement discussions that take place between Caraballo and the Estate.

(*Id*. at PageID# 1977.)

9

On August 11, 2021, the state trial court denied each of Catholic Charities' summary judgment motions. *See* State Court Action (docket). Two days later, on August 13, 2021, the state trial court held the Final Pretrial Conference. (*Id.*) As noted above, counsel, parties, and representatives with "full settlement authority" had been directed to attend. (*Id.*) Mr. Bonanni testified that he attended the Final Pretrial via Zoom. (Bonanni Depo. at Tr. 90-91.) Settlement discussions were conducted but the matter did not resolve. *See* State Court Action (docket). It is not entirely clear but it appears that Catholic Charities offered either $900,000 or $1 million to settle the case during the Final Pretrial. (Forbes Depo. at Tr. 113-114; Bonanni Depo. at Tr. 90-91.) The Estate declined.

On August 16, 2021, Catholic Charities filed a notice of interlocutory appeal to the Eighth District Court of Appeals of Ohio, challenging the trial court's decision with respect to the denial of its motion for summary judgment based on political subdivision immunity. (Doc. No. 110-9.) Caraballo was not a party to this appeal. (*Id.*) Attorney Forbes testified that neither Catholic Charities nor PESLIC warned him that Catholic Charities was planning on appealing the state trial court's decision. (Forbes Depo. at Tr. 155-156.)

Despite Catholic Charities' appeal, the Estate indicated its intention to proceed with trial on September 13, 2021 against Caraballo alone. (Doc. No. 110-10 at PageID# 1993.) Indeed, in his deposition in the instant action, the Estate's Counsel, Attorney Deratany, testified that "I was fully intending to [go to trial against Caraballo], and, in fact, I knew that [Attorney] Forbes was put in a very desperate position, so I was excited to." (Deratany Depo. (Doc. No. 119-2) at Tr. 129.)

 On August 23, 2021 (i.e., three weeks before the September 13, 2021 trial date), Catholic Charities filed a Motion to Stay, in which it sought an Order "staying all proceedings in this case pending appeal, including any trial against alleged agent and former employee of Catholic Charities,

10

Defendant Nancy Caraballo." (Doc. No. 110-10 at PageID# 1990.) On that same date, Caraballo also filed a Motion to Stay Proceedings pending appeal. (Doc. No. 110-11.) The state trial court did not rule on the parties' Motions to Stay until September 10, 2021— three days before trial. (Doc. No. 110-22.) On that date, the state court granted Catholic Charities' Motion to Stay and stayed the entire case "pending the instant appeal." (*Id.*)

Although the state trial court ultimately granted Catholic Charities' Motion and stayed the entire case, it was not clear to the parties, at the time, whether the state court would, in fact, stay the case as to Caraballo. Thus, between the filing of Catholic Charities' Notice of Appeal on August 16, 2021 and the state trial court's Order staying the case on September 10, 2021, Caraballo faced the potential prospect of facing trial as the sole defendant.

Attorney Forbes testified that he was greatly concerned about the possibility that Caraballo would face trial alone, particularly given the fact that, up to that point, he had been collaborating with counsel for Catholic Charities. (Forbes Depo. at Tr. 37, 44-45, 132-134.) On August 18, 2021, Forbes spoke with Attorney Sebaugh to request Catholic Charities' cooperation in preparing for the possibility of trial proceeding against Caraballo. (Doc. No. 110-19 at PageID# 2064.) Forbes followed up that conversation with a letter on August 23, 2021, in which he stated (in relevant part) as follows:

> *** As we have repeatedly discussed, I based my trial preparation, prior to Catholic Charities' appeal, on Catholic Charities' participation at trial. Catholic Charities' presence changed my preparation in significant ways. For example, after consultation with Catholic Charities, I did not retain separate experts, and I did not prepare redundant motions *in limine*. Now that Ms. Caraballo faces trial as the sole Defendant *** I am asking for cooperation from Catholic Charities. It is in the interests of Catholic Charities to cooperate.

(*Id*.)  Attorney Forbes then specifically requested assistance from Catholic Charities in the following areas: (1) expert witnesses; (2) motions *in limine*; (3) presentation of exhibits; (4) jury instructions and jury interrogatories; and (5) transcripts of the recorded interviews of witnesses in the criminal investigation.  (*Id*. at PageID#s 2065-2066.)

The uncertainty surrounding both whether the case would proceed to trial solely against Caraballo, and whether Catholic Charities would "cooperate" with Caraballo as set forth above, prompted Attorney Forbes to actively pursue settlement discussions with the Estate.[4]  On August 23, 2021, Attorney Deratany emailed Attorney Forbes in an "attempt to resolve the case with your client Nancy Caraballo through an entry of certain stipulations and a modified bench trial."  (Doc. No. 110-12 at PageID# 2012.)  Attorney Deratany outlined the terms of the proposed bench trial as follows:

> The parties would go forward with a modified bench trial, wherein the court will hear our abbreviated opening statements, consider the stipulations set forth below, along with submission of the depositions in lieu of trial testimony, and final trial briefs.  We would further agree that the parties have agreed that any judgment amount should not be not less than $10,000,000 or more than $34,000,000, and that both attorneys recommend an amount between those numbers.  Further, plaintiff will agree and stipulate not to pursue collection of any judgment against Nancy Caraballo in her personal capacity, and will accept an assignment of Mrs. Caraballo's declaratory claims of coverage against Catholic Charities, and that nothing agreed to between the parties shall affect plaintiff's claims against Catholic Charities for Negligent Supervision and Hiring.

(*Id*.)  Attorney Deratany then proposed eight stipulations, including stipulations that Caraballo "acted as an agent and employee of Catholic Charities" and that Caraballo "failed to meet the standard of care" in various respects.  (*Id*. at PageID# 2012- 2013.)  In a series of emails exchanged later that day, Attorney Forbes requested additional time to respond to the Estate's offer and agreed to ask the

---

[4] A review of the deposition testimony in this matter reveals that Attorney Forbes was interested in pursuing the possibility of settlement even prior to Catholic Charities' Notice of Appeal. (Forbes Depo. at Tr. 47; Deratany Depo. at Tr. 92, 124-125; Exhibit 8 to Deratany's Deposition.)

state trial court not to rule on Caraballo's Motion to Stay in the interim.  (*Id*. at PageID# 2011.)  Over the next several days, Attorney Forbes and Attorney Deratany negotiated the terms of the Estate's proposed stipulations.  (Doc. No. 110-27 at PageID#s 2133-2141.)

On August 26, 2021, Attorney Sebaugh responded to Attorney Forbes' letter requesting cooperation from Catholic Charities in preparing for trial.  (Doc. No. 110-27 at Page ID# 2132.)  Attorney Sebaugh declined to provide the support requested by Attorney Forbes, explaining that "it is not in our client's best interests to share information specifically prepared for trial/pre-trial defense purposes, due in large part to the substantial divergent interests of Cath[olic] Char[ities] and Nancy Caraballo, occasioned by Ms. Caraballo's criminal actions…." (*Id*.)  Attorney Sebaugh stated, however, that "we remain optimistic that the trial court will make the legally correct decision with regard to stay of all trial proceedings."[5]  (*Id*.)  *See also* Forbes Depo. at Tr. 139-140; Forbes Depo. Exh. 29 (Doc. No. 119-1 at PageID# 3501.)

On August 30, 2021, Attorney Forbes emailed Attorney Deratany to advise that he (Forbes) "agree[d] in principle with the structure of a modified court trial with stipulations" but noted that "[w]e have not agreed as to what that court trial will look like or the exact stipulations." (Doc. No. 110-14 at PageID# 2027.)  Attorney Forbes repeatedly cautioned that "we will not have an agreement until Ms. Caraballo approves it," i.e., "until she signs a settlement agreement."  (*Id*.)

---

[5] Mr. Bonanni testified that whether or not to cooperate with Forbes was "a decision for Catholic Charities' counsel." (Bonanni Depo. at Tr. 103.)  He stated that he did not participate in the decision not to cooperate with Attorney Forbes and, further, that he was not aware of Catholic Charities' decision not to cooperate prior to Attorney Sebaugh's email. (*Id*. at Tr. 108-109, 110.) Attorney Forbes acknowledged that he did not have personal knowledge regarding whether or not Attorney Sebaugh discussed this position with PESLIC.  (Forbes Depo. at Tr. 140.)

On that same date, the Estate filed a Pre-Trial Memorandum in the state trial court regarding (among other things) its "settlement position" as to Caraballo.  (Doc. No. 110-13.)  In relevant part, the Estate advised the state trial court as follows:

> At this juncture Catholic Charities['] insurers, have refused to agree on indemnification for Ms. Caraballo's conduct. However, ongoing discussions have resulted in a general potential agreement between plaintiff and Ms. Caraballo in principal [sic] with final details to be worked out. The parties would agree to a bench trial and stipulate on submission of depositions as evidence in the case and agree upon certain stipulations. The parties would also agree to suggest an amount to the court to assist in the Court's determination of damages. In consideration, Plaintiff will not seek to collect the judgment against Nancy Caraballo individually, and defendant Caraballo would convey an assignment of the declaratory judgment action against the insurers. Plaintiff anticipates that the trial would take a day, as both sides would give an opening statement, tender it's [sic] evidence, and leave it to the court to make factual findings and a ruling. The parties would agree that there would be no appeal.

(*Id*. at PageID# 2021.)

According to PESLIC, the Estate's Pre-Trial Memorandum was the first time that PESLIC became aware that the Estate and Caraballo reached a potential settlement agreement.  (Bonanni Depo. at Tr. 115.)  Shortly thereafter, on September 3, 2021, Mr. Bonanni sent a letter to Attorney Forbes, in which he noted that "PESLIC has not denied indemnity for Caraballo." (Doc. No. 110-19 at PageID# 2068.)  He explained that "[i]nstead, PESLIC has reserved the right to deny coverage only if damages are awarded against Caraballo due to uncovered conduct."  (*Id*.)  Mr. Bonanni then stated as follows:

> Even though PESLIC has not denied coverage for Caraballo, PESLIC was recently advised that she intends to enter into a settlement with Plaintiff in which she will agree to participate in a trial where she makes several stipulations and agrees to an amount of damages to be entered against her. As Caraballo is aware, PESLIC has been engaged in prior settlement discussions with Plaintiff on Caraballo's behalf.  PESLIC therefore requests that Caraballo cooperate with PESLIC and allow it to continue to engage in reasonable settlement discussions on her behalf.

(*Id*.)  Mr. Bonanni then reminded Attorney Forbes of the Policies' cooperation provisions, as well as the requirement that Caraballo "must obtain prior written approval before offering or agreeing to pay an amount which is in excess of the Retained Limit in order to settle any Claim under this Coverage Part."  (*Id*. at PageID# 2069.)  He requested that "Caraballo not enter into the settlement agreement and instead continue to cooperate in defense of the lawsuit."  (*Id*.)  Lastly, Mr. Bonanni reiterated that "PESLIC will indemnify Caraballo, up to the limits of the Policy, for any covered judgment entered against her should she forego the current settlement proposed by Plaintiff."  (*Id*.)

Attorney Forbes responded via letter dated September 3, 2021.  (Doc. No. 110-19 at PageID# 2071-2074.)  Therein, Attorney Forbes replied (in relevant part) as follows:

> I acknowledge PESLIC has not expressly denied coverage to Ms. Caraballo, but PESLIC now asks Ms. Caraballo not to enter into an agreement that would protect her assets and psychological health. PESLIC reminds Ms. Caraballo that if she takes action to protect her financial and emotional well-being it will strip her of coverage and leave her exposed to a lifetime of the Estate's attempts to enforce a judgement. PESLIC asks that Ms. Caraballo cooperate with what it characterizes as 'reasonable' settlement discussions on her behalf. The purpose of your letter is to warn Ms. Caraballo that if she protects herself after you abandoned her, you will deny her coverage.

(*Id*. at PageID#s 2071.) Attorney Forbes then accused PESLIC of failing to engage in reasonable settlement negotiations and complained that Catholic Charities ("presumably at the direction of PESLIC") chose not to make a settlement offer until a month before trial and then only offered $1 million. (*Id*. at PageID# 2072.) Attorney Forbes further asserted that, after Catholic Charities appealed, "PESLIC stopped what little effort it was making to settle." [6]  (*Id*.)  He accused PESLIC of "abandoning" Caraballo, claiming that "Catholic Charities –with the certain knowledge and guidance

---

[6] During his deposition, however, Attorney Forbes acknowledged that, prior to this letter, he never requested that PESLIC make a settlement offer on Caraballo's behalf or otherwise assist in Caraballo's defense.  (Forbes Depo. at Tr. 102-103, 114.)

of PESLIC—refused to provide [the] cooperation" requested by Attorney Forbes in his August 23, 2021 letter. (*Id*. at PageID#s 2072-2073.) Attorney Forbes demanded that PESLIC offer its policy limits of $10 million and, "if that offer does not result in the case settling," demanded that PESLIC "(i) reverse its prior abandonment of Ms. Caraballo and assist her in the defense of the case, and (ii) in the event of an adverse verdict, agree to post a supersedeas bond to permit Ms. Caraballo to appeal without the Estate enforcing a judgment." (*Id*. at PageID# 2073.)

PESLIC's coverage counsel, Monica Sullivan, responded via letter dated September 6, 2021. (Doc. No. 110-16.) Therein, Ms. Sullivan stated that "[t]he purpose of this response is to reiterate and further confirm that PESLIC will indemnify for all costs incurred to defend Ms. Caraballo against covered claims, including all reasonable defense costs and expert witness fees necessary to defend her at an actual trial on the merits." (*Id*. at PageID# 2041.) Ms. Sullivan also advised that PESLIC "agrees to provide indemnity for any supersedeas bond, up to its policy limits, necessary for Ms. Caraballo to appeal any covered judgment entered against her." (*Id*.) Ms. Sullivan then reminded Attorney Forbes that PESLIC has no duty to defend under the Policies and "instead, it is the Diocese that has the duty to defend and controls the defense of the lawsuit." (*Id*. at PageID# 2042.) Ms. Sullivan then explained, at some length, why she believed that PESLIC had attempted in good faith to settle the State Court Action and had not abandoned Caraballo. (*Id*. at PageID# 2043.) She concluded by requesting that Caraballo "honor the terms of the Policy and cooperate in her defense by continuing to insist that the case against her be stayed pending appeal and by not entering into any settlement agreement regarding purportedly covered liability." (*Id*.)

Nonetheless, the Estate and Caraballo continued their settlement negotiations. By September 3, 2021, the parties had shifted from a "modified bench trial" to a "Consent Judgment and Stipulations

16

as to Certain Facts." (Doc. No. 110-27 at PageID#s 2149-2153.)  The Estate and Caraballo reached agreement on the terms of the Consent Judgment on September 8, 2021.  (Doc. No. 110-17 at PageID# 2046; Doc. No. 110-27 at PageID#s 2153-2206.)   Among other things, this Consent Judgment contained (1) a series of stipulations; (2) agreement to entry of a civil judgment against Caraballo in the amount of $36 million; and (3) an assignment, in which the Estate agreed to not attempt to collect the $36 million judgment against Caraballo individually and Caraballo agreed to assign to Plaintiff "any and all claims she may have for indemnification, and bad faith against Catholic Charities and each of its applicable insurers."  (*Id.* at PageID#s 2208-2210.)

Later that same day, Attorney Deratany requested that the court enter the Consent Judgment and indicated that Caraballo intended to "withdraw h[er] now pending Motion to Stay the Proceedings, should the Court enter the Consent Judgment."  (Doc. No. 110-27 at PageID# 2213, 2214.)  On September 9, 2021, however, Attorney Forbes and Attorney Deratany agreed to settle the case for $36 million plus an assignment "regardless of whether the [state trial court] accepts this as a consent judgment."  (Doc. No. 110-20 at PageID# 2085.)  Attorney Deratany explained that "the purpose of a settlement is that it cannot be undone by Catholic Charities['] Insurers raising of the jurisdictional issue even if the consent judgment were to be undone by a later ruling." (*Id.*)

On September 10, 2021, the trial court granted Catholic Charities' Motion to Stay All Proceedings Pending Appeal, and stayed the case pending appeal.  (Doc. No. 110-22.)  The docket in the State Court Action reflects that the state court had not entered the parties' proposed Consent Judgment prior to entering the stay.  *See* State Court Action (docket).  Attorney Deratany emailed the state trial court on September 10, 2021 and advised that "Nancy Caraballo and plaintiff have entered a settlement agreement regardless of a consent judgment."  (Doc. No. 110-27 at PageID# 2232.)

17

On September 20, 2021, Attorney Deratany sent a letter to PESLIC and excess insurer Berkley Insurance demanding payment of $36 million based on the Estate's settlement with Caraballo. (Doc. No. 110-23.) Attorney Deratany accused PESLIC of bad faith and demanded payment by October 20, 2021. (*Id.*) Meanwhile, the Estate and Caraballo continued to negotiate the language of the parties' "settlement agreement" over the next several weeks. *See, e.g.,* Doc. Nos. 110-21. The Estate and Caraballo reached final agreement on the terms of the Settlement Agreement by no later than September 29, 2021, although the Agreement was not signed by Caraballo until November 2, 2021. (Doc. No. 110-27 at PageID# 2238; Doc. No. 110-26.)

Among other things, the final, signed Settlement Agreement contains "general findings of fact" regarding Jordan Rodriguez and the abuse he suffered at the hands of Larissa and Christopher; as well as "findings" regarding certain duties that Caraballo owed to Jordan and to the Rodriguez family. (Doc. No. 110-26.) In addition, the Estate and Caraballo agree that Caraballo "acted as an employee and agent of Catholic Charities at all times that she was providing … services, as a Parent Educator, to the Rodriguez family." (*Id.*) The Settlement Agreement provides that Caraballo failed to meet the standard of care required of a Parent Educator in several respects with respect to her interactions with the Rodriguez family. (*Id.*)

The Settlement Agreement provides for entry of civil judgment against Caraballo in the total amount of $36 million dollars, with payment due to the Estate. (*Id.*) The Settlement Agreement also contains the following assignment provisions:

> 23. **In further consideration the parties agree that Plaintiff will not attempt to collect any portion of this judgement against Nancy Caraballo individually, and that Nancy Caraballo further agrees to assign and take all steps necessary to cause to assign to Plaintiff any and all claims she may have for indemnification, and bad faith against Catholic Charities and each of its applicable insurers**. Nancy Caraballo agrees to cooperate with Plaintiff's counsel to sign all documents,

18

> appear at all hearings required, and otherwise to cooperate in the indemnification and
> bad faith claims. **

(*Id*.) (emphasis added).

Subsequently, on April 21, 2022, the Eighth District Court of Appeals of Ohio affirmed the state trial court's opinion denying Catholic Charities' motion for summary judgment on the basis of political subdivision immunity. *See Rodriguez v. Catholic Charities Corp.,* 190 N.E.3d 673 (Ohio App. 8th Dist. 2022). Catholic Charities appealed to the Supreme Court of Ohio, which declined to accept the appeal on August 16, 2022. *See Rodriguez v. Catholic Charities Corp*., 167 Ohio St.3d 1483, 2022-Ohio-2765 (Ohio 2022).

On November 2, 2022, the state trial court lifted the stay and set the matter for jury trial on April 19, 2023. *See* State Court Action (docket). Caraballo filed a Revised Motion to Enforce Settlement Agreement on November 14, 2022. (Doc. No. 110-27.) In a Journal Entry issued on December 19, 2022, the state trial court granted Caraballo's Revised Motion to Enforce and dismissed the Estate's claims against Caraballo with prejudice. *See* State Court Action (docket). The state trial court noted, however, that the Estate's "claims against Catholic Charities Corporation, which arise in part based on Caraballo's actions, remain pending." *Id*.

After several continuances, jury trial commenced on March 25, 2024. (*Id*.) On April 23, 2024, the jury returned a verdict in favor of the Estate and against Catholic Charities in the amount of $960,000.[7] (*Id*.) The matter resumed on April 30, 2024 for the punitive damages phase of trial.

---

[7] According to local news coverage, the jury awarded the Estate a total of $12 million dollars but found that multiple individuals and entities shared responsibility for Jordan's death. Specifically, the jury found that (1) Larissa is 52% responsible; (2) Cuyahoga County Department of Children and Family Services is 15% responsible; (3) MetroHealth is 11% responsible; (4) Christopher Rodriguez is 12% responsible; (5) Catholic Charities is 8% responsible; and (6) Nancy Caraballo is 2% responsible. *See* www.cleveland.com ("Jury Finds Catholic Charities negligent in death of 4-year-old; agency must pay estate at least $960,000") (April 23, 2024.) Thus, Catholic Charities was found responsible for 8% of

19

(*Id.*)  On May 2, 2024, the jury decided that Catholic Charities did not act with actual malice and, thus, declined to award punitive damages.  (*Id.*)

### D.     Relevant Procedural History in this Court

Meanwhile, on October 19, 2021, PESLIC filed a Complaint for Declaratory Judgment in this Court against the Estate, Caraballo, Catholic Charities Corporation, and The Roman Catholic Diocese of Cleveland, Ohio.[8]  (Doc. No. 1.)  PESLIC's Complaint sets forth two counts, pleaded in the alternative.

In Count 1, PESLIC alleges that the settlement agreement "between Caraballo and the Estate constitutes a material breach of the obligations imposed by the Policies" because Caraballo never obtained PESLIC's consent prior to entering into the settlement agreement and/or purportedly assigning her benefits under the Policies to the Estate.  (*Id.* at ¶¶ 63, 64, 67-68.)  PESLIC further alleges that "the agreement between Caraballo and the Estate is the product of collusion" and that Caraballo "has not undertaken any liability in the settlement agreement but is instead being released from all liability in exchange for striking an unreasonable deal and impermissibly assigning her purported benefits under the Policies."  (*Id.* at ¶ 68.)  According to PESLIC, because the settlement agreement "constitutes a material breach of the Policies and Ohio public policy, the settlement agreement cannot impose any duties or liabilities on PESLIC pursuant to the Policies."  (*Id.* at ¶ 69.)  PESLIC seeks "a declaration that the settlement constitutes a material breach of the Policies and Ohio public policy, does not impose on PESLIC any duties or liabilities under the Policies, including any

---

$12 million, or $960,000.  *Id.*  Nancy Caraballo (who was no longer a party at the time of the jury trial) was found responsible for 2% of $12 million, or $240,000. *Id.*

[8] The Complaint provides that Defendants Catholic Charities and The Roman Catholic Diocese of Cleveland, Ohio ("the Diocese") are named as necessary parties only.  (Doc. No. 1 at ¶¶ 8, 9.)

duty of indemnification, and excuses PESLIC from any obligation of further performance under the Policies as to Caraballo."  (*Id*. at ¶ 71.)

Count II of PESLIC's Complaint is captioned "Declaratory Relief, 28 U.S.C. § 2201(a) Lack of Coverage Under the Policies, In the Alternative to Count 1."  Therein, PESLIC alleges that, "to the extent that the settlement is held not to constitute a material breach of the Policies and Ohio public policy, the settlement is nonetheless not covered under the Policies, and is subject to numerous exclusions."  (*Id.* at ¶ 76.)  PESLIC contends that 11 separate exclusions under various parts of the Policies operate to separately bar coverage, based on the facts in the underlying case.  (*Id.* at ¶¶ 77-87.)

Catholic Charities and the Diocese filed Answers to PESLIC's Complaint on December 3, 2021.  (Doc. Nos. 23, 24.)  Caraballo answered PESLIC's Complaint in December 2021.  (Doc. Nos. 25, 27.)  The Estate filed a Motion to Dismiss on December 13, 2021, which PESLIC opposed.  (Doc. No. 26, 29.)  On June 28, 2022, this Court issued a Memorandum Opinion & Order denying the Estate's Motion to Dismiss Count I of PESLIC's Complaint.  (Doc. No. 32.)  With respect to the Count II, the Court denied the Estate's request to dismiss this Count but agreed that it should be stayed pending resolution of the state court proceeding.  (*Id*. at pp. 13-14.)

Thereafter, on July 12, 2022, the Estate filed an Answer to PESLIC's Complaint, as well as Counterclaims against PESLIC and Caraballo.  (Doc. No. 36.)  Counterclaim I was against PESLIC and is captioned "Breach of Contract."  (*Id.* at p. 21, ¶¶ 42-49.)  Therein, the Estate alleged that "[u]nder well-established and existing Ohio case law, Caraballo was entitled to enter into the settlement with [the Estate] and assign her right to indemnification under the Policy, without the consent of PESLIC, due to PESLIC's refusal to timely accept coverage on behalf of Caraballo, or

contest that Caraballo was entitled to coverage under the Policies." (*Id*. at ¶ 45.) The Estate alleged that "[p]ursuant to the settlement agreed to by [the Estate] and Caraballo, Caraballo has become liable for $36,000,000.00." (*Id*. at ¶ 46.) The Estate claimed that "Carballo is liable for an 'Ultimate Net Loss' of $35,000,000.00 which PESLIC is required to indemnify Caraballo for the $10,000,000.00 the Policy provides for." (*Id*. at ¶ 47.) The Estate claimed it is entitled to a Declaration that: (1) Caraballo constitutes an "Insured" under the Policy; (2) Caraballo caused a "Bodily Injury" through an "Occurrence" when she caused the death of Jordan Rodriguez; (3) PESLIC's refusal to indemnify Carballo constitutes a breach of its contractual obligations; (4) PESLIC is obligated to indemnify Caraballo for the full amount of $10,000,000.00; and (5) any other relief this Court deems just and proper.[9] (*Id*. at ¶ 49.)

On August 16, 2022, PESLIC filed a Motion to Dismiss, or in the Alternative, Stay the Estate's Counterclaims. (Doc. No. 42.) Therein, PESLIC argued that this Court lacked subject matter jurisdiction over Counterclaim I because the Estate did not have standing to assert its claim for breach of the 2017 Policy. (*Id*. at pp. 7-9.) PESLIC noted that the Estate's standing is predicated on Caraballo's assignment as set forth in the Settlement Agreement. (*Id*.) PESLIC asserted that this assignment is invalid because both the 2017 and 2019 Policies contain anti-assignment provisions that provide that an insured may not transfer his/her rights under those Policies without PESLIC's written consent. (*Id*.) Because the Estate failed to allege that Caraballo obtained PESLIC's consent,

---

[9] Counterclaim II was against Caraballo and sought "declaratory relief that if there is not indemnity by PESLIC then there is no settlement agreement with Nancy Caraballo." (*Id*. at pp. 22-23, ¶¶ 50-57.) Caraballo filed an Answer on August 8, 2022. (Doc. No. 41.) As discussed *infra*, the Estate later filed an Amended Counterclaim, which did not include a counterclaim against Caraballo. (Doc. No. 98.)

PESLIC asserted that the Policies' anti-assignment provisions render Caraballo's purported assignment to the Estate invalid. (*Id*.)

The Estate filed a Brief in Opposition on September 15, 2022. (Doc. No. 43.) Relying on *Ward v. Custom Glass & Frame*, 105 Ohio App.3d 131 (Ohio App. 8th Dist. 1995) and *Patterson v. Cincinnati Ins. Co*., 91 N.E.3d 191 (Ohio App. 8th Dist. 2017), the Estate argued that Caraballo was not required to obtain PESLIC's consent to either the settlement or the assignment because PESLIC "deliberately evad[ed] indemnification while attempting to control the litigation." (*Id*. at pp. 2, 6-12.) In *Ward* and *Patterson*, *supra,* the state appellate courts found that "when an insurance company maintains control of the litigation while at the same time denying coverage," a potential insured's decision to settle without the consent of the insurance company is not "arbitrary and unreasonable and, therefore, [the insured's] rights under the policy [are] not forfeited by a consent judgment." *Patterson*, 91 N.E.3d at 191 (citing *Ward*, 105 Ohio App.3d at 136.) The Estate argued that, under *Ward* and *Patterson*, PESLIC's "bad faith behavior obviated Caraballo's need for obtaining consent to settle or to assign her rights under the policy, because she acted reasonably." (*Id*. at p. 6.)

On January 17, 2023, this Court issued a lengthy Memorandum Opinion & Order granting in part and denying in part PESLIC's Motion to Dismiss. (Doc. No. 65.) Therein, the Court first found that, unless an exception applies, Caraballo's purported assignment of her right to seek indemnification under the 2017 Policy is not valid because it is barred by the 2017 Policy's anti-assignment provision. (*Id*. at pp. 16-17.) The Court then found that the exceptions set forth in *Ward* and *Patterson* did not save the Estate's Counterclaim I, explaining (in relevant part) as follows:

> For the following reasons, the Court finds that *Ward* and *Patterson* are distinguishable from the instant case. First, in both of those cases, the state courts noted that the insurance companies had a duty to defend (and did defend) under the policies at issue, thereby "maintain[ing] control" of the underlying litigations. By contrast, here, the

23

Estate does not allege that PESLIC had a duty to defend under the 2017 Policy. Indeed, to the contrary, that Policy expressly indicates that PESLIC has "no duty to defend a Claim against an Insured."  Nor does the Estate sufficiently allege facts suggesting that PESLIC otherwise "maintained control" of the state court litigation. *** Under the specific circumstances presented (most notably, the fact that there was no duty to defend under the Policy), the Court finds that *Ward* and *Patterson* are distinguishable because the Estate fails to sufficiently allege that PESLIC maintained control of the underlying state court litigation.

The Estate's arguments to the contrary are without merit. In its Brief in Opposition, the Estate states that PESLIC "request[ed] summary adjudication from the Ohio trial court on the issue of Caraballo's 'scope of employment'" and, thus, "attempt[ed] to argue that Caraballo acted outside the scope of employment and … is not insured." This allegation is not contained anywhere in the Estate's Counterclaim. To the contrary, in paragraph 28 of its Counterclaim, the Estate asserts that "Catholic Charities filed a motion for summary judgment requesting that the trial court find, as a matter of law, that Caraballo acted outside the scope of her employment."  There is no allegation in the Counterclaim that PESLIC instructed Catholic Charities to file this (or any) motion in the underlying litigation. Nor is there any allegation in Counterclaim I that PESLIC provided a defense to Catholic Charities at any point during that litigation. Accordingly, the Court finds that the Estate failed to sufficiently allege that PESLIC "maintained control" of the state court litigation, rendering this case distinguishable from both *Ward* and *Patterson*.

The Court further finds that the instant case is distinguishable from *Ward* and *Patterson* because the Estate fails to allege that PESLIC denied coverage in the underling litigation. In both *Ward* and *Patterson*, the state courts rested their decisions on the fact that, at the same time that the insurance companies were maintaining control of the underlying litigation, those insurers made it clear to their insureds that that there was no coverage under the relevant policies and, therefore, no duty to indemnify. *See Ward*, 105 Ohio App.3d at 135, 136; *Patterson*, 91 N.E.3d at 197, 199. Here, however, the Estate does not sufficiently allege that PESLIC denied coverage to Caraballo under the 2017 Policy. To the contrary, in its Counterclaim, the Estate alleges that PESLIC failed to inform either Caraballo or the Estate of their position regarding coverage and/or failed to "timely accept" or "contest" coverage. *** The [Estate's] allegation that PESLIC failed to take a position on coverage and refused to "timely accept" or contest coverage, however, is not the same as an allegation that PESLIC made the decision to deny coverage and communicated that decision to the insureds, as was the case in both *Ward* and *Patterson*.

(*Id*. at pp. 22-26) (internal citations to the record omitted).  After addressing (and rejecting) several

other arguments raised by the Estate, the Court concluded that Caraballo's assignment is not valid.

(*Id*. at pp. 26-34.)  The Court dismissed Counterclaim I but denied PESLIC's Motion to the extent it sought dismissal of Counterclaim II.  (*Id*. at pp. 35-36.)

On January 30, 2023 (five months after the pleading amendment deadline), the Estate filed a Motion for Leave to Amend its Answer and Counterclaim.  (Doc. No. 68.)  Therein, the Estate sought leave to (1) reassert its previously dismissed claim for breach of contract against PESLIC; and (2) assert a new claim against PESLIC under Ohio Rev. Code § 3929.06 "based on PESLIC's failure to satisfy the settlement in the underlying case."  (*Id*. at p. 3.)  PESLIC filed a Brief in Opposition on February 13, 2023, to which the Estate replied on February 21, 2023.  (Doc. Nos. 82, 85.)  On June 7, 2023, the Court issued a Memorandum Opinion & Order (1) granting the Estate's request for leave to amend to assert a "direct action" counterclaim under Ohio Rev. Code § 3929.06; but (2) denying the Estate's request for leave to amend to reassert a counterclaim for breach of contract against PESLIC.  (Doc. No. 92.)

The Estate then filed its Amended Counterclaim on June 20, 2023.  (Doc. No. 98.)  The factual allegations in the Estate's Amended Counterclaim (Doc. No. 98 at ¶¶ 8-40) are identical to those set forth in its original Counterclaim (Doc. No. 36 at ¶¶ 8-41.)  The Estate's Amended Counterclaim then set forth a new claim for a Declaratory Judgment pursuant to Ohio Rev. Code § 3929.06, predicated on the state trial court's issuance of the Consent Judgment between the Estate and Caraballo. (Doc. No. 98 at pp. 20-22.) The Estate alleged that, within that Consent Judgment, the state court entered a civil judgment against Caraballo for a total of $36 million with payment due to the Estate.  (*Id*.)  The Estate alleged that the "underlying judgment provided an assignment of the amount owed to Catholic Charities."  (*Id*.)  The Estate next alleged that Caraballo is an "Insured" under the 2017 Policy and,

therefore, "Catholic Charities is required to indemnify Caraballo and pay the Estate according to the underlying judgment and O.R.C. § 3929.06." (*Id*.)

PESLIC moved to dismiss the Estate's Amended Counterclaim with prejudice on June 28, 2023. (Doc. No. 99.) The Estate opposed the Motion. (Doc. No. 101.) On September 19, 2023, the Court issued a Memorandum Opinion & Order granting PESLIC's Motion. (Doc. No. 106.) Therein, the Court rejected the Estate's argument that it was not required to plead sufficient facts to rebut PESLIC's affirmative defense that it had no obligations under the Policies because Caraballo had failed to obtain PESLIC's consent to her settlement with the Estate. (*Id*. at pp. 9-11.) Specifically, the Court found that the "undisputed facts plead by the Estate in its Amended Counterclaim (as well as the Exhibits thereto) conclusively establish PESLIC's consent-to-settle defense." (*Id*. at p. 9.) Thus, the Court determined that the Estate was required to plead sufficient facts to establish an exception to PESLIC's defense, such as the exception set forth in *Ward* and *Patterson*. (*Id.* at p. 11.) The Court then found that "the Estate does not even attempt to argue that it has done so … [a]nd, indeed, it could not, as the factual allegations set forth in the Amended Counterclaim are identical to the factual allegations in the Estate's original Counterclaim, which this Court already dismissed on the grounds that it failed to sufficiently plead the *Ward/Patterson* exception." (*Id*.) The Court dismissed the Estate's Amended Counterclaim with prejudice, finding that the Estate "had the opportunity to amend its Counterclaim with the benefit of discovery yet failed to include any additional factual allegations to rebut PESLIC's consent-to-settle affirmative defense." (*Id.* at p. 15.)

On December 15, 2023, PESLIC filed the instant Motion for Summary Judgment. (Doc. No. 110.) The Estate filed a Brief in Opposition on January 29, 2024, in which it argued (among other things) that the report and testimony of its expert, Judge William Taylor, was "alone sufficient for

this Court to deny PESLIC's [summary judgment motion.]" (Doc. No. 112.) Caraballo did not file a response to PESLIC's Motion for Summary Judgment. On February 19, 2024, PESLIC filed a Motion to Exclude Judge Taylor's Expert Report and Testimony, as well as a Reply Brief in support of its Motion for Summary Judgment." (Doc. Nos. 113, 114.) The Estate filed a Brief in Opposition to PESLIC's Motion to Exclude on March 4, 2024, to which PESLIC replied on March 11, 2024. (Doc. Nos. 116, 117.)

## II.     Standard of Review

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is 'genuine' only if based on evidence upon which a reasonable jury could return a verdict in favor of the non-moving party." *Henderson v. Walled Lake Consol. Sch.*, 469 F.3d 479, 487 (6th Cir. 2006) (citing *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 451 (6th Cir. 2004)). "Thus, 'the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.'" *Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). A fact is "material" only "if its resolution might affect the outcome of the suit under the governing substantive law." *Henderson*, 469 F.3d at 487 (citing *Hedrick*, 355 F.3d at 451).

At the summary judgment stage, "[a] court should view the facts and draw all reasonable inferences in favor of the non-moving party." *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 628 (6th Cir. 2018) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). "[T]he moving party bears the initial burden of showing that there is no genuine dispute of material fact." *Ask Chems., LP v. Comput. Packages, Inc.*, 593 Fed. Appx 506, 508 (6th Cir. 2014)

(citing *Anderson*, 477 U.S. at 256). The moving party may satisfy this initial burden by "identifying those parts of the record which demonstrate the absence of any genuine issue of material fact." *Lindsey v. Whirlpool Corp.*, 295 Fed. Appx 758, 764 (6th Cir. 2008) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "[I]f the moving party seeks summary judgment on an issue for which it does not bear the burden of proof at trial," the moving party may also "meet its initial burden by showing that 'there is an absence of evidence to support the nonmoving party's case.'" *Id*. (quoting *Celotex*, 477 U.S. at 325).

Once the moving party satisfies its burden, "the burden shifts to the non-moving party who must then point to evidence that demonstrates that there is a genuine dispute of material fact for trial." *Ask Chems.*, 593 Fed. Appx at 508–09 (citing *Anderson*, 477 U.S. at 256). "[T]he nonmoving party may not simply rely on its pleading but must 'produce evidence that results in a conflict of material fact to be solved by a jury.'" *MISC Berhad v. Advanced Polymer Coatings, Inc.*, 101 F. Supp.3d 731, 736 (N.D. Ohio 2015) (quoting *Cox*, 53 F.3d at 150).

## III.    Analysis

### A.    Motion to Exclude Judge Taylor's Expert Report and Testimony

Prior to reaching the substantive arguments raised in PESLIC's Motion for Summary Judgment, the Court will first address PESLIC's Motion to Exclude Judge Taylor's Expert Report and Testimony. *See Brainard v. Am. Skandia Life Assur. Corp*., 432 F.3d 655, 667 (6th Cir. 2005) ("Generally, a district court should dispose of motions that affect the record on summary judgment before ruling on the parties' summary judgment motions."); *Goodwin v. American Marine Express, Inc.,* 2021 WL 848948 at * 8 (N.D. Ohio March 5, 2021).

#### 1.    Judge Taylor's Expert Report and Testimony

The Estate retained Judge William Taylor to render an opinion regarding whether PESLIC (1) "maintained control of" the underlying State Court litigation; and/or (2) engaged in "bad faith" towards Caraballo. (Doc. No. 116 at p. 4.) Judge Taylor's Expert Report includes a "Qualifications" section which provides the following information. Judge Taylor graduated from Northwestern University School of Law in 1979. (Taylor Expert Report (Doc. No. 115-2) at PageID# 2570.)  He worked as an associate at the law firm of Peterson Ross from 1979 to 1982. (*Id*.)  *See also* Taylor Depo. (Doc. No. 119-3) at Tr. 13-15.  While employed at Peterson Ross, Judge Taylor practiced insurance litigation, including representing Lloyd's of London. (Taylor  Expert Report at PageID# 2570; Taylor Depo. at Tr. 14.) Judge Taylor testified that his job consisted "mostly [of] research, writing, getting reports and sending them back to Lloyd's of London." (Taylor Depo. at Tr. 14.)

Judge Taylor left Peterson Ross in 1982, and moved to Cuyahoga County, Ohio where he helped run a gubernatorial political campaign for Jerry Springer. (*Id*. at Tr. 15.) After that, he moved to California and worked on another political campaign. (*Id*.)  In 1983, Judge Taylor joined the law firm of Sachnoff Weaver, where he practiced "business litigation." (*Id*.)  *See also* Taylor Expert Report at PageID# 2570.  Judge Taylor worked as an associate at Sachnoff Weaver from 1983 to 1985. (Taylor Expert Report at PageID# 2570.)  He testified that he did not represent insurance companies in this position. (Taylor Depo. at Tr. 16.)

Judge Taylor then worked as the Chief of Litigation of Revenue for the Illinois Attorney General's Office from 1985 to 1987. (Taylor Expert Report at PageID# 2570.)  He testified that, in this position, he was a "tax collector," supervised 30 people, and appeared in court occasionally. (Taylor Depo. at Tr. 16.)  From 1987 until approximately 1989 or 1990, Judge Taylor worked on several political campaigns, including those of Walter Mondale, Michael Dukakis, Harold

Washington, and Carole Mosley Braun.  (*Id*. at Tr. 17-18.)  In 1990 or 1991, Judge Taylor went into

private practice, where he did "litigation, real estate, wills, divorces" and "whatever came in the

door."  (*Id*. at Tr. 17.)  Judge Taylor testified that he did not represent insurance companies while he

worked in private practice and did not recall being appointed by insurance companies to represent

insureds.  (*Id*. at Tr. 17-18.)  Judge Taylor then served as a state trial court judge in Cook County,

Illinois from 1994 to 2012; and as a state appellate judge for the Appellate Court of Illinois, First

District from 2012 to 2016.  (Taylor Expert Report at PageID# 2570.)  In 2016, he formed an

organization called Mediation by Judges.  (*Id*.)  He has worked as a mediator since 2016.  (*Id*.)

In his Expert Report, Judge Taylor states as follows.  He first opines that "the facts of this

case, indicate that PESLIC engaged in a pattern of conduct that would indicate that they controlled

the litigation" in the underlying state court case.  (*Id*. at PageID# 2571.)  Judge Taylor states that he

bases his opinion on the fact that "of the more than 40 depositions in this case, Catholic Charities was

lead counsel and asked more than 70% of the questions."  (*Id*.)  He then opines:

> PESLIC as the insurer for both Catholic Charities and Nancy Caraballo (the employee
> of Catholic Charities) owed a duty to act in a reasonable and good faith manner toward
> their insured and their insured's employee. It is typical and customary that where there
> is a joint or unified defense, such as in this underlying case, that the insurer will advise
> that one of the attorneys acts as lead counsel. It is obvious, based upon the depositions,
> the emails I have reviewed, and statements of Mr. Forbes in deposition, that Ms. Beth
> Sebaugh and her team, acted as lead counsel in the underlying litigation, by the fact
> that they led the depositions, and took the lead on retaining the defense experts. By
> custom and practice, the insurer would have direct knowledge of the fact that Ms.
> Sebaugh is acting as lead counsel and would approve of said actions. Catholic
> Charities and therefore, PESLIC maintained control of the litigation.

(*Id*.)

Judge Taylor next opines that "it was apparent that PESLIC refused to agree to indemnify Ms.

Caraballo."  (*Id*.)  He explains that "the usually sanctioned legal remedy for an insurer who contests

30

the duty to indemnify or duty to defend is to file a declaratory action, and not 'sit on their hands' refusing to commit to indemnification, while controlling the litigation." (*Id.*) Judge Taylor states that "PESLIC did not do this, but instead controlled the litigation while simultaneously refusing to commit to indemnification up and through the scheduled trial date of September 13, 2021." (*Id.*) He opines that "this would constitute legal maneuvering which at a minimum is a constructive refusal to indemnify." (*Id.*)

Judge Taylor next opines that "[a]s a judge and lawyer, and based upon [his] review of the underlying deposition transcripts and the law, it is also clear that Catholic Charities filed a frivolous interlocutory appeal 28 days before the trial of this matter." (*Id.*) He states that Catholic Charities' argument that it was a "state agency" (and, therefore, entitled to political subdivision immunity) is "not a legally sound position." (*Id.*) Judge Taylor opines that "it is clear that the filing of this appeal was so that PESLIC could avoid having Catholic Charities go to trial with Nancy Caraballo." (*Id.*) He also asserts that Catholic Charities' "scope of employment" summary judgment motion was "further proof that PESLIC was attempting to control the litigation, while also attempting to deny the insureds [sic] employee from indemnification for her negligent acts." (*Id.*) Judge Taylor opines that Catholic Charities' failure to notify Caraballo of its intent to file an interlocutory appeal "constituted bad faith toward the insured, Nancy Caraballo." (*Id.*)

Lastly, Judge Taylor explains and opines as follows:

It is also clear from the emails that PESLIC through Ms. Sebaugh was not cooperating with regard to allowing Mr. Forbes access to Catholic Charities['] expert witnesses. This would create a frustration of purpose, and was in bad faith toward their insured Nancy Caraballo. The withholding of experts, and the sudden withdrawal of assistance in the preparation for trial put their insured in an untenable trial posture, and subjected Caraballo to facing trial without proper experts, or preparation, and thus she likely would have faced the possibility of a significantly higher judgment. To be faced with a trial, without sufficient expert testimony, and assistance put Caraballo in a position

31

where she really had no choice but to cut his [sic] costs and settle the lawsuit to avoid being faced with an excessive verdict.

It is also my opinion that PESLIC'S refusal to make any offer of settlement within their policy was arbitrary, capricious and in bad faith, considering the facts of the underlying case. The damages that the Rodriguez family suffered by the loss of their brother, Jordan clearly exceeded $900,000.00. Making no offer within their policy indicates bad faith.

(*Id*. at PageID#2571-2572.)  Judge Taylor concludes by stating that "the decision of Caraballo to settle the claim despite the insurer refusing to give written consent was not arbitrary or unreasonable." (*Id*. at PageID#2572.)

### 2.    Analysis

PESLIC argues that Judge Taylor's Expert Report and Testimony should be excluded under Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579 (1993) because (1) Judge Taylor "is not qualified to offer opinions concerning whether PESLIC controlled the defense of the underlying litigation;" (2) his opinions "are irrelevant because he focuses on whether PESLIC controlled the defense of Catholic Charities, not the defense of  Caraballo;" and (3) his opinions are unreliable because he did not use any methodology in reaching them and, instead, relied solely on "logic."  (Doc. No. 114 at PageID# 2554, 2556, 2560.)  PESLIC further maintains that Judge Taylor's opinions should be excluded because they "contradict the undisputed record evidence" and, in some instances, constitute legal conclusions.  (*Id*. at PageID# 2559, 2562.)

In response, the Estate argues that Judge Taylor "was retained to provide expert opinion regarding PESLIC's control of the litigation and for PESLIC acting in bad faith in its control of the litigation regarding Caraballo."  (Doc. No. 116 at PageID# 2663.)  The Estate argues that Judge Taylor is qualified to offer expert testimony and opinions on these issues because he worked in the past for an insurance defense firm and "has been a judge for decades with experience dealing with

insurance coverage."  (*Id*. at PageID# 2660, 2664.)   The Estate maintains that Judge Taylor's testimony is relevant because his "expertise was to explain how PESLIC controlled the defense of Caraballo based upon its actions through its representation of Catholic Charities, i.e., by allegedly instructing Catholic Charities' attorneys not to cooperate with Caraballo and "abandoning her throughout the litigation." (*Id*. at PageID# 2665.)  Judge Taylor also opined that PESLIC did, in fact, have a duty to defend Caraballo because she was an employee of Catholic Charities.  (*Id*.)

 Lastly, the Estate argues that Judge Taylor's opinions are reliable because he relied on a "specific means and methodology" in reaching his conclusions, including by relying on "the facts, the cases, case law, understanding insurance terms, being an appellate and trial judge having to decide on issues with insurances, and his experiences as an attorney in determining his opinion."  (*Id*. at PageID# 2667.)  The Estate insists that Judge Taylor's opinions do not constitute legal conclusions or contradict available evidence.  (*Id*. at PageID#s 2666-2669.)

Federal Rule of Evidence 702 entrusts district courts with a "gatekeeping role" to "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant." *Daubert*, 509 U.S. at 597.  *See also In re Onglyza (Saxagliptin) & Kombiglyze (Saxagliptin & Metformin) Prods. Liab. Litig*., 93 F.4th 339, 345 (6th Cir. 2024).  As recently amended, Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and

(d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.  Thus, the opinion offered by the expert must satisfy three requirements to be admissible: "First, the witness must be qualified by 'knowledge, skill, experience, training, or education.'  Second, the testimony must be relevant, meaning that it 'will assist the trier of fact to understand the evidence or to determine a fact in issue.'  Third, the testimony must be reliable." *In re Scrap Metal Antitrust Litig*., 527 F.3d 517, 528–29 (6th Cir. 2008) (quoting Fed. R. Evid. 702); *accord United States v. Rios*, 830 F.3d 403, 413 (6th Cir. 2016).

Notably, Rule 702 was amended in December 2023 to "clarify and emphasize that expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule."  Fed. R. Evid. 702,  advisory committee's notes to 2023 amendments.  As the Advisory Committee Notes explain: "[M]any courts have held that the critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology, are questions of weight and not admissibility.  These rulings are an incorrect application of Rules 702 and 104(a)." *Id.  See also In re Onglyza (Saxagliptin) & Kombiglyze (Saxagliptin & Metformin) Prods. Liab. Litig*., 93 F.4th at 348, n.7.  Additionally, "Rule 702(d) was rephrased to emphasize that an expert opinion must 'reflect[ ] a reliable application' of the expert's methodology." *Id.* at 345, fn 4 (quoting Rule 702(d)).

 Federal district courts have broad discretion to exclude proposed expert testimony.  *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 139 (1997).  *See also In re Scrap Metal*, 527 F.3d at 528 ("[W]e will not substitute our own judgment for that of the district court and will reverse an evidentiary decision 'only where we are left with a definite and firm conviction that [the district court] committed a clear error of judgment.'") (citation omitted).  Indeed,  both the Supreme Court and the Sixth Circuit

have emphasized that Rule 702 affords district courts "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).  *See also United States v. Simpson*, 845 Fed. Appx 403, 409 (6th Cir. 2021).

For the following reasons, the Court finds that Judge Taylor's Expert Report and Testimony is inadmissible and should be excluded.  First, the Court finds that Judge Taylor is not qualified to offer an opinion regarding whether PESLIC maintained control of the underlying state court litigation and/or engaged in bad faith towards Caraballo.  As noted above, Rule 702 provides that an expert witness must be qualified by "knowledge, skill, experience, training, or education." Fed. R. Evid. 702.  As the Sixth Circuit has explained, "[t]he issue with regard to expert testimony is not the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question." *Berry v. City of Detroit,* 25 F.3d 1342, 1351 (6th Cir. 1994). *See also Mudaj v. Maiden*, 951 F.3d 364, 370 (6th Cir. 2020). "Whether a proposed expert's experience is sufficient to qualify the expert to offer an opinion on a particular subject depends on the nature and extent of the experience." *United States v. Cunningham*, 679 F.3d 355, 379 (6th Cir. 2012).  *See also Huffman v. Electrolux Home Products, Inc.*, 129 F.Supp.3d 529, 538 (N.D. Ohio 2015).  In assessing an expert's qualifications, the Sixth Circuit has noted that an expert "need not have complete knowledge about the field in question." *Mannino v. Int'l Mfg. Co.*, 650 F.2d 846, 851 (6th Cir. 1981). Rather, "the only thing a court should be concerned with in determining the qualifications of an expert is whether the expert's knowledge of the subject matter is such that his opinion will likely assist the trier of fact in arriving at the truth." *Id*. at 850.  *See also Davis Electronics Co., Inc. v. Springer Capital, LLC*, 2023 WL 8939443 at * 7 (W.D. Ky. Oct. 19, 2023).

Here, the Court concludes that Judge Taylor is not qualified to offer expert opinions regarding the specific subject matters addressed in his Expert Report.  While Judge Taylor has a long and distinguished career as a lawyer, jurist, and campaign manager, the Court finds that he does not have sufficient expertise in insurance litigation to provide a proper foundation for him to testify about whether PESLIC "maintained control of" the underlying state court litigation or engaged in bad faith under Ohio law.  As Judge Taylor acknowledged, his only direct experience in representing insurance companies was the roughly three years he spent as an associate at Peterson and Ross from 1979 to 1982—over thirty-five (35) years ago.  (Taylor Depo. at Tr. 14-19.)  Although he testified that he represented Lloyd's of London during that time period, Judge Taylor stated that his work consisted "mostly [of] research, writing, getting reports and sending them back to Lloyd's of London."  (Taylor Depo. at Tr. 14.)  The Estate does not direct this Court's attention to any testimony or evidence that this work (or any other insurance defense work that Judge Taylor may have performed at Peterson and Ross) provided him with any particular knowledge or experience relevant to the determination of when an insurance company "maintains control of litigation" or engages in bad faith.  Judge Taylor acknowledged that he could not recall ever being appointed by an insurance company to represent clients in litigation.  (Taylor Depo. at Tr. 16 -18.)  Moreover, there is no evidence that Judge Taylor worked closely with claims adjusters, discussed litigation strategy with his insurance company clients, specifically evaluated and provided advice concerning coverage issues, or was involved in handling claims or litigation concerning whether an insurance company "maintained control" over a litigation or engaged in bad faith.

Nor does the Estate direct this Court's attention to any testimony or evidence that Judge Taylor gained any particular knowledge or expertise relevant to these issues after leaving Peterson

and Ross.  Judge Taylor could not recall representing any insurance companies while working at Sachnoff Weaver between 1983 and 1985.  (Taylor Depo. at Tr. 16.)  Likewise, there is no evidence that he gained any experience relevant to insurance litigation, to include coverage litigation, while working in private practice, as Chief of Litigation for Revenue for the Illinois Attorney General's Office between 1985 and 1987, and/or while working on various political campaigns between 1987 and 1994.

The Estate, however, argues that Judge Taylor is qualified because "as a judge, almost all [of his] cases involved insurance, and he has ample experience working with legal matters involving insurance coverage."  (Doc. No. 116 at p. 5.)  During his deposition, Judge Taylor testified that "as a judge, practically every case I've dealt with deals with insurance regardless of what the facts are. There's always a claims adjuster in the room."  (Taylor Depo. at Tr. 34.)  However, the fact that claims adjusters were "in the room" or that many of Judge Taylor's cases "deal[t] with insurance" in some undefined way is not sufficient, standing alone, to demonstrate that Judge Taylor has any particular knowledge or expertise regarding when an insurance company is "maintaining control of" litigation or engaging in bad faith, either generally or under Ohio law.  Nor is the mere fact that Judge Taylor has been a judge for many years sufficient, standing alone, to demonstrate that he has sufficient expertise regarding insurance defense litigation or, more specifically, the manner in which insurance companies manage or "control" litigation involving their insureds.[10]

In sum, while Judge Taylor is highly accomplished and could undoubtedly provide expert testimony on any number of issues, the Court finds that his background and experience simply do not

---

[10] The Court also notes that Judge Taylor testified that he has never before been retained as an expert to opine on subject matter of an insurance company's control of litigation or bad faith.  (Taylor Depo. at Tr. 21.)  Further, there is no evidence before the Court that Judge Taylor has written articles or given presentations on either of these issues.

relate sufficiently to the subject matter on which he opines in the instant case.  As a result, the Court finds that Judge Taylor's knowledge and experience is not such that his opinions will likely be helpful to or otherwise assist the trier of fact.  Accordingly, the Court finds that Judge Taylor's Expert Report and testimony should be excluded on the grounds that Judge Taylor is not qualified.

The Court further finds that Judge Taylor's testimony is not reliable.  In assessing reliability under Rule 702, district courts should consider such factors as "whether the testimony is based upon 'sufficient facts or data,' whether the testimony is the 'product of reliable principles and methods,' and whether the expert 'has applied the principles and methods reliably to the facts of the case.'" *In re Scrap Metal*, 527 F.3d at 528-529 (quoting Rule 702). In addition, *Daubert* provided a non-exclusive checklist for trial courts to consult in evaluating the reliability of expert testimony.  *Id*. at 529.  These factors include (1) whether a theory or technique can be and has been tested, (2) whether the theory or technique has been subjected to peer review and publication, (3) whether, with respect to a particular technique, there is a high known or potential rate of error and whether there are standards controlling the technique's operation, and (4) whether the technique enjoys general acceptance within the relevant scientific, technical, or other specialized community. *Daubert*, 509 U.S. at 592–94.  *See also In re Scrap Metal*, 527 F.3d at 528-529; *Dilts v. United Group Services*, 500 Fed. Appx. 440, 445 (6th Cir. 2012).  The test of reliability is "flexible," and the *Daubert* factors do not constitute a "definitive checklist or test," but may be tailored to the facts of a particular case. *Kumho*, 526 U.S. at 150.

In sum, the requirement that an expert's testimony be reliable means that it must be "supported by appropriate validation—i.e., 'good grounds,' based on what is known." *Daubert,* 509 U.S. at 590. *See also In re Scrap Metal,* 527 F.3d at 529. "The task for the district court in deciding whether an

expert's opinion is reliable is not to determine whether it is correct, but rather to determine whether it rests upon a reliable foundation, as opposed to, say, unsupported speculation." *In re Scrap Metal*, 528 F.3d at 529-530. *See also Huffman,* 129 F.Supp.3d at 537. District courts have "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Kumho*, 526 U.S. at 152. *See also Madej*, 951 F.3d at 374.

Here, the Court finds that Judge Taylor failed to sufficiently explain how his opinions are the product of reliable principles and methods, as opposed to speculation and anecdotal personal knowledge. When asked in deposition to explain his methodology, Judge Taylor testified as follows:

> Q:     Apart from just your experience as a judge and a litigator, is there any other methodology you are using to go from the facts you say you're relying on to the opinions you're offering?
>
> A:     I'm not sure of that answer.
>
> Q:     What do you mean?
>
> A:     I don't know if I'm -- what other things I would be relying on besides the facts, the cases, case law, understanding insurance terms, being on the appellate court and having to decide issues with insurance issues, being a trial judge where insurance issues are coming up with every single case, practically, so not only dealing with big cases, and my experience.
>
> Q:     Just to be clear, is there a method that you are employing other than just your experience in order to form the opinions you are offering in this action?
>
> A:     Relying on the facts of the case.
>
> Q:      But is there a method you are using to get from the facts to the opinions?
>
> A:     Yeah, it's called logic.
>
> Q:     Just logic.
>
> A:     Yes.
>
> Q:     Okay. Anything else?

> A:     Besides my experience, the cases I've dealt with, being on the appellate court, being -- dealing with insurance companies and being a lawyer at Peterson Ross, no.

(Taylor Depo. at Tr. 35-36.)   However, as discussed at length above, the Court finds that neither Judge Taylor's three years of experience at an insurance defense firm in the 1980's nor his tenure as a state trial and appellate judge are sufficient to demonstrate that he has specialized knowledge and experience regarding whether an insurance company "maintains control of" litigation and/or engages in bad faith. [11]   Thus, Judge Taylor's reliance on his experience and some ill-defined concept of "logic" to form his opinions does not constitute a reliable methodology. [12]

Moreover, the Court notes that Judge Taylor also appeared to rely heavily on speculation and his own personal anecdotal knowledge to reach his opinions.  Specifically, in his deposition, Judge Taylor insisted that PESLIC was "very active in all parts of" the state court litigation and that Catholic Charities' attorney, Beth Sebaugh, was "following PESLIC's orders" when she refused to cooperate

---

[11] The Court also notes that, while Judge Taylor testified that he relied on the "facts of the case," the record reflects that he was mistaken about several key facts.  For example, Judge Taylor testified that he believed that PESLIC retained Attorney Forbes to represent Caraballo.  (Taylor Depo. at Tr. 47.)  However, as discussed *supra,* both Attorney Forbes and Mr. Bonanni testified that it was Catholic Charities (and not PESLIC) that retained Forbes to represent Caraballo and paid his attorney fees. (Forbes Depo. at Tr. 14; Bonanni Depo. at Tr. 19, 114-115.)  In addition, Judge Taylor testified that he was unaware that, after Catholic Charities filed its interlocutory appeal, Catholic Charities asked the state court to stay the entire action, including all proceedings against Caraballo.  (Taylor Depo. at Tr. 30-31.) As discussed above, however, the record clearly reflects that Catholic Charities filed a motion asking the state trial court to stay "all proceedings in this case, including any trial against alleged agent and former employee of Catholic Charities, Defendant Nancy Caraballo. (Doc. No. 110-10 at PageID# 1990.)

[12] Judge Taylor testified that, in reaching his opinions, he "used the same methods and means that [he] used presiding as a judge in making decisions over issues involving an insurer's duty to defend to its insured."  (Taylor Depo. at Tr. 57.) To the extent that Judge Taylor's conclusions amount to legal opinions, they improperly invade the province of this Court and are inadmissible on that basis as well.  *See United States v. Zipkin,* 729 F.2d 384 (6th Cir. 1984) (finding that it was prejudicial error for district court to allow bankruptcy judge to testify as an expert witness to a legal conclusion). *See also Goodwin,* 2021 WL 848948 at * 9 ("Indeed, the Sixth Circuit 'has repeatedly held that it is impermissible for a trial judge to delegate [her] duty to determine the law of the case to an expert.'") (quoting *Molecular Tech Corp. v. Valentine,* 925 F.2d 910, 919 (6th Cir. 1991)).  *See also Ross Bros. Construction Co., Inc. v. Markwest Hydrocarbon, Inc*., 196 Fed. Appx. 412, 415 (6th Cir. 2006) ("This circuit has held that a district judge has discretion – and the duty—to exclude 'legal opinion' it deems improper…").

with Attorney Forbes and filed Catholic Charities' "frivolous" interlocutory appeal.  (Taylor Depo. at Tr. 32, 37-38.)  Judge Taylor testified that he based his conclusion that PESLIC was "very active in all parts of" the state court litigation in large part on the fact that Mr. Bonanni brought in Attorney Patton from Chicago to assist with Catholic Charities' trial preparation.  (*Id*. at Tr. 32-33.)  Judge Taylor testified that:  "… I know John Patton.  He's been in my courtroom a number of times.  I know he doesn't play second fiddle to anybody.  He's lead attorney or he's not.  He's the captain of the ship."  (*Id*. at Tr. 33.)  He later emphasized that "[Attorney Patton] is lead.  He – he's the captain. Everyone follows his orders."  (*Id*. at Tr. 61.)  Likewise, Judge Taylor based his conclusion that Attorney Sebaugh was "following PESLIC's orders," in part, on his belief that, once Attorney Patton was retained, Attorney Patton would have taken control of the state court litigation on behalf of PESLIC.  (*Id*. at Tr. 38-39, 61-65.)

Judge Taylor's personal experience and beliefs regarding Attorney Patton are not a proper basis or methodology for reaching his expert opinions in this case.  *See Madej*, 951 F.3d at 375 ("Courts have repeatedly found opinions unreliable when they are based more on an expert's subjective belief than on an objective method that can be tested.") *See also In re Davol, Inc./C.R. Bard, Inc., Polypropylene Hernia Mesh Products Liability Litigation*, 546 F.Supp.3d 679, 694 (S.D. Ohio 2021) ("Personal knowledge alone is not a permissible topic of expert testimony."); *In re Heparin Product Liability Litigation*, 2011 WL 1059660 at * 8 (N.D. Ohio March 21, 2011) (noting that "'testimony of an expert that constitutes mere personal belief as to the weight of the evidence invades the province of the jury'") (quoting *Indiana Ins. Co. v. Gen. Elec Co*., 326 F.Supp.2d 844, 847 (N.D. Ohio 2004)).  Moreover, to the extent Judge Taylor is drawing inferences from his personal experiences with Attorney Patton to reach his conclusions, this is inappropriate because "only a jury

can draw inferences like this." *In re Davol,* 546 F.Supp.3d at 694.  And, finally, to the extent Judge

Taylor's opinions are based on speculation or an "I know it when I see it" kind of approach, his

testimony is inadmissible.  *See In re Davol*, 546 F.Supp.3d at 694; *Huffman*, 129 F.Supp.3d at 540.

Lastly, the Court finds that several of Judge Taylor's opinions are inadmissible because they

constitute legal conclusions regarding the ultimate legal issues in this matter.  As another judge in

this District recently explained:

> Rule 704 makes clear that expert testimony is "not objectionable because it embraces an ultimate issue to be decided by the trier of fact." Fed. R. Evid. 704. **But the Rule does *not* allow experts to opine broadly on the legal issues in dispute.** There is an important difference between admissible expert testimony "that suggest[s] the answer to the ultimate issue or that give[s] the jury all the information from which it can draw inferences as to the ultimate issue" and inadmissible expert testimony on the "ultimate question of liability." *Berry v. City of Detroit*, 25 F.3d 1342, 1353 (6th Cir. 1994) (recognizing that Rule 704 does not admit expert testimony on whether police conduct amounts to deliberate indifference because it embraces the ultimate legal question of liability, not subsidiary issues suggesting the answer to that question). *** Put another way, an expert may not invade the province of the court by conveying or expressing legal standards or terminology to the jury. *See Torres v. County of Oakland*, 758 F.2d 147, 150–51 (6th Cir. 1985).

*Buddenberg v. Weisdack*, ---- F.Supp.3d -----, 2024 WL 159001 at * 30 (N.D. Ohio Jan. 16, 2024)

(italics in original; emphasis in bold added). *See also Berry*, 25 F.3d at 1353-1354 ("It is the

responsibility of the court, not testifying witnesses, to define legal terms. *** If the rule were

[otherwise], we would soon breed a whole new category of 'liability experts' whose function would

be to tell the jury what result to reach…"); *Goodwin*, 2021 WL 848948 at * 9 (noting that "experts

'may not testify to the legal implications of conduct' or 'tell the jury what result to reach'") (quoting

*Commodores Entm't Corp. v. McClary*, 879 F.3d 1114, 1128 (11th Cir. 2018)).

The Court finds that several of Judge Taylor's opinions cross the line into inappropriate legal

conclusions.  For example, Judge Taylor opines that: (1) PESLIC's alleged conduct "constitutes legal

maneuvering which at a minimum is a constructive refusal to indemnify;" (2) "PESLIC's refusal to make any offer of settlement within their policy was arbitrary, capricious, and in bad faith;" and (3) "the decision of Caraballo to settle the claim despite the insurer refusing to give written consent was not arbitrary or unreasonable."  (Taylor Expert Report at Page ID# 2571-2572.)  The Court finds that these opinions are impermissible legal conclusions regarding the ultimate legal issues in this case and, thus, are inadmissible on that basis.  *See Brainard*, 432 F.3d at 663-664 (noting that "'[a]n expert who supplies nothing but a bottom line supplies nothing of value to the judicial process'") (quoting *Mid-State Fertilizer Co. v. Exch. Nat'l Bank*, 877 F.2d 1333, 1339 (7th Cir. 1989)); *Buddenberg*, 2024 WL 159001 at * 31 ("[T]he parties may not create … an issue of fact simply by retaining experts to make their legal arguments disguised as opinions to be offered to a jury.").

The Court also notes that, to the extent Judge Taylor's expert opinions encompass the defining of legal terms (such as "the duty to indemnify" and "the duty to defend"), such testimony is also not an appropriate subject of expert testimony.  *See Berry*, 25 F.3d at 1353 (noting that it is not appropriate for expert witnesses to "define legal terms"); *Killion v. KeHe Distributors, LLC*, 761 F.3d 574, 592-593 (6th Cir. 2014) (explaining that expert testimony "may not … 'define legal terms'") (quoting *Berry*, 25 F.3d at 1353).

Accordingly, and for all the reasons set forth above, PESLIC's Motion to Exclude the Expert Report and Testimony of Judge Taylor (Doc. No. 114) is GRANTED.[13]

**B.     Motion for Summary Judgment**

---

[13] Because the Court finds that Judge Taylor's Expert Report and Testimony are inadmissible for the reasons discussed *supra*, the Court need not address PESLIC's additional argument that Judge Taylor's Report and testimony are not relevant.

Turning to PESLIC's Motion for Summary Judgment, PESLIC argues that it is entitled to judgment in its favor on Count I of its Complaint because there is no genuine issue of material fact that (1) Caraballo materially breached the "consent-to-settle" provisions of the 2017 and 2019 Policies; (2) Caraballo's material breach of the Policies' consent-to-settle provisions was not excused by the "exceptions" set forth in *Ward, supra* and *Patterson, supra*; and (3) PESLIC therefore owes no obligations under the Policies (including no obligation to indemnify) to Caraballo or her assignees, including the Estate.  (Doc. No. 110.)

With regard to the Caraballo's breach of the Policies, PESLIC notes that both the 2017 and 2019 Policies expressly provide that Caraballo must obtain PESLIC's prior written approval before "offering or agreeing to pay an amount in excess of the Retained Limit in order to settle any claim." (*Id*. at p. 13.) PESLIC asserts that there is no genuine issue of material fact that PESLIC did not consent to the settlement between Caraballo and the Estate and that "Caraballo's unambiguous and material breach of the Consent to Settle Provision extinguishes any right she might have to benefits under the Policies."  (*Id*.)

With regard to the *Ward* and *Patterson* decisions, PESLIC argues that those cases "make clear … that an insured can only be excused for a beach of a consent-to-settle clause if two elements are satisfied: [1] the insurer 'maintain[ed] control of the litigation while [2] at the same time denying coverage.'" (*Id*. at p. 14) (quoting *Patterson*, 91 N.E.3d at 199).  Relying heavily on Attorney Forbes' deposition testimony that he and Caraballo were the only decision makers regarding her defense, PESLIC argues that "the undisputed facts confirm that PESLIC did not control Caraballo's defense." (*Id*. at p. 15.)   PESLIC further maintains that its  June 2019 and September 2021 letters to Attorney Forbes confirm that PESLIC "did not deny coverage to Caraballo."  (*Id*.)  Instead, PESLIC asserts, it

44

"repeatedly informed Caraballo that coverage could be available under both the 2017 and 2019 Policies." (*Id*.)  Accordingly, PESLIC maintains that there is no genuine issue of material fact that it has no obligation to either Caraballo or the Estate under either Policy.  (*Id*. at p. 16.)

In response, the Estate does not dispute that Caraballo failed to obtain PESLIC's consent before settling with the Estate but argues that there are nonetheless "substantial issues of fact and credibility that must be determined by the trier of fact before a declaratory judgment can be issued." (Doc. No. 112 at pp. 2, 4.)  Specifically, the Estate maintains that "the primary issues to be decided … involve the amount of control that PESLIC exercised over the Underlying Litigation, whether PESLIC effectively refused to indemnify Caraballo for any judgment in the Underlying Litigation, and whether – under these circumstances – Caraballo's decision to settle the claims against her in the Underlying Litigation was reasonable." (*Id*. at p. 3.)

The Estate asserts that there are "numerous disputed facts" relating to each of these issues. (*Id*. at p. 7.)  The Estate argues that PESLIC's control of the litigation is demonstrated by evidence that Attorney Forbes "based his entire trial preparation on the basis that this was a joint defense between Catholic Charities and Ms. Caraballo."[14]  (*Id*. at p. 11.)  The Estate argues that there are genuine issues of material fact regarding whether PESLIC "assumed the duty to defend Catholic Charities" by retaining Attorney Patton; directed Catholic Charities to refuse to assist Attorney Forbes after appealing the state court's denial of its summary judgment motion on political subdivision immunity; and/or otherwise "controlled the litigation" in the underlying State Court Action.  (*Id*. at

---

[14] The Estate also argues that the report and testimony of  Judge Taylor is sufficient, standing alone, to create a genuine issue of material fact.  (Doc. No. 112.)  However, the Court has excluded Judge Taylor's Expert Report and Testimony and, therefore, will not consider it for all the reasons discussed *supra*.

pp. 11-15.)  Although named as a defendant in this action, Caraballo did not file a response to PESLIC's Motion for Summary Judgment.[15]

In response, PESLIC argues that "the Estate effectively concedes that PESLIC did not deny coverage to Caraballo, which singlehandedly defeats the *Ward* Exception." (Doc. No. 113 at PageID# 2540.)  PESLIC also asserts that, given Attorney Forbes' deposition testimony, the Estate "cannot create a genuine issue of material fact concerning the control of Caraballo's defense." (*Id.*)

As an initial matter, the Court notes that the record reflects (and the Estate does not dispute) that both the 2017 and 2019 Policies require an Insured to obtain PESLIC's consent to settle a claim above the Retained Limit.  Specifically, and as discussed above, the Policies require that an Insured "must obtain our prior written approval before offering or agreeing to pay an amount which is in excess of the Retained Limit in order to settle any Claim under the [applicable] Coverage Part." (Doc. No. 110-2 at PageID# 1713; Doc. No. 110-3 at PageID# 1815.)  The record also reflects (and the Estate does not dispute) that Caraballo did not obtain PESLIC's written consent to her Settlement Agreement with the Estate. (Bonanni Depo. at Tr. 121.)  *See also* PESLIC's September 3, 2021 and September 6, 2021 letters to Forbes (Doc. No. 110-16, Doc. No. 110-19 at PageID# 2068-2070.) Accordingly, and in the absence of any meaningful argument to the contrary, the Court finds that Caraballo materially breached the 2017 and 2019 Policies when she entered into the Settlement Agreement with the Estate to resolve its claims in the underlying State Court Action.

Thus, the only issue before the Court is whether Caraballo's material breach is excused under the test set forth in *Ward* and *Patterson*.  The Court, therefore, begins with a discussion of the facts

---

[15] As noted above, PESLIC also named Catholic Charities and the Diocese as Defendants in the instant action.  (Doc. No. 1.)  However, the Complaint provides that both of these defendants are named as necessary parties only.  (*Id.* at ¶¶ 8, 9.) Thus, neither Catholic Charities nor the Diocese filed responses to PESLIC's Motions.

and holdings of those cases.  In *Ward, supra,* plaintiff Barry Ward, an employee of Custom Glass & Frame ("Custom"), was injured on the job while using a bench saw.  Custom was insured under a policy issued by American Commercial Ins. Co. ("American").  Ward filed an intentional tort action against Custom in state court.  American, under the reservation of rights clause in the policy, agreed to defend the lawsuit.  *Ward*, 105 Ohio App.3d at 135.  However, "[a]t all times, American maintained that its policy did not cover the injury sustained by [Ward], a notice implied and actual that it would not pay if Custom was found liable."  *Id.*

The case went to arbitration, where Ward was awarded $13,200.00 in compensatory damages.  American appealed the arbitration award to the state trial court, where American again "took the position that Custom was not covered for the injury and would be solely liable for damages."  *Id.* at 133.  Custom's corporate counsel wrote a letter to American demanding that it either accept coverage of Ward's claim or withdraw from the appeal.  *Id.*  American refused to provide coverage and subsequently withdrew its notice of appeal.  *Id.*  Custom then settled with Ward for the arbitrated amount of $13,200.00, which was reduced to judgment.  *Id.*  Ward subsequently filed a supplementary complaint against American seeking recovery for the amount of the judgment pursuant to Ohio Rev. Code § 3929.05.  *Id.*

The parties filed cross motions for summary judgment.  The trial court granted Ward's motion for summary judgment, finding that Custom had not forfeited its right to indemnification.  *Id.*  American appealed, arguing (among other things) that Custom's agreement to settle with Ward constituted a breach of the policy's cooperation and "no action" clauses, which, in turn, relieved American of any and all liabilities arising from the policy coverage.  *Id.* at 134.  The state appellate court rejected American's argument, explaining as follows:

47

The purpose for paying premiums of insurance coverage is to buy peace of mind so that when accidents occur, the insured can trust that his insurance company will not renege on its agreement.  **When an insurance company refuses to provide coverage and at the same time seeks to maintain control of the same litigation, it disclaims liability to indemnify and creates a frustration of purpose.  Such conduct would compel a person of reasonable faculties to cut his costs and settle a lawsuit to avoid the possibility of a higher judgment**.  *See Sanderson v. Ohio Edison Co.* (1994), 69 Ohio St.3d 582, 586, 635 N.E.2d 19, 23–24.  An insurance company which believes and maintains a position that coverage does not exist must make a clean break from the case and should not subject the insured to a guessing game or by its conduct cause the insured to incur more expenses than necessary.  After all, whether the insurer can or cannot pay under the policy is not really affected by its decision not to defend the case. *See Aetna Cas. & Sur. Co. v. Buckeye Union Cas. Co.* (1952), 157 Ohio St. 385, 47 O.O. 270, 105 N.E.2d 568; *see, also, Sanderson, supra*.

In the instant case, appellants' attempt to 'have their cake and eat it, too' put Custom in an untenable position. Appellants, being in full control of the case, would like the case to go on. If they win, Custom is vindicated and neither appellants nor Custom pays any liability. However, if they lose, they still pay no liability because they have a defense based on the reservation of rights clause and Custom pays, only this time, the liability might be more than what Custom would have paid had it settled out of court.

After reviewing the facts and circumstances of this case, **we hold that Custom's decision to settle without the consent of appellants was not arbitrary or unreasonable and its rights under the policy were not forfeited by its action to settle**. *See Luntz, supra; see, also, Great Am. Indemn. Co. v. Corpus Christi* (Tex.Civ.App.1945), 192 S.W.2d 917. It acted as any reasonable prudent person would have under the circumstances. Appellants, therefore, suffered no material prejudice that they did not bring upon themselves. *See Costa v. Cox, supra*. We have considered all the cases cited by appellants and found them not controlling beyond the extent stated in this opinion.

*Id*. at 136 (emphasis added).   The court then went on to conclude that Ward's injury was covered by Custom's policy with American and affirmed the judgment of the trial court's judgment in Ward's favor.  *Id*. at 138-144.

The same state appellate court reached a similar conclusion several years later in *Patterson v. Cincinnati Ins. Co.*, 91 N.E.3d 191 (Ohio App. 8th Dist. 2017). In that case, Plaintiff Jolene Patterson's husband, Douglas, was killed when the bucket of an excavator disengaged and struck him

as he stood in a trench where he was working.  Jolene filed suit against Douglas' employer, Fabrizi

Trucking & Paving, for intentional tort.  She also sued another Fabrizi entity, Fabrizi Recycling,

which had purchased the subject excavator.  The Fabrizi entities were both covered under policies

issued by Cincinnati Insurance Company ("Cincinnati").  Cincinnati provided an attorney to the

Fabrizi entities throughout the underlying litigation "but maintained that it did not have a duty to

indemnify either entity."  *Id.* at 193.  After extensive discovery, motion practice, and multiple

settlement conferences, Jolene reached a settlement with the Fabrizi entities for $3,119,000.  *Id.* at

194.  The trial court entered a consent judgment and closed the case.  *Id.*

Meanwhile, Jolene filed a separate action against Cincinnati seeking indemnification under

the policy issued to the Fabrizi entities.  She attached to the complaint a "covenant to execute and

assignment of rights," pursuant to which the Fabrizi entities agreed to pay $119,000 to Jolene and

assigned their rights under the Cincinnati policy to Jolene to pursue the remaining $3 million balance

of the consent judgment.  *Id.* at 195.  The parties filed cross motions for summary judgment.  The

trial court granted Cincinnati's motion, finding that Cincinnati was not bound by the assignment

executed by Jolene and the Fabrizi entities.  *Id.*  Jolene appealed.

The state appellate court first found that summary judgment was properly granted in favor of

Fabrizi Trucking & Paving because there was no coverage under the policy for Jolene's intentional

tort claim against that entity.  *Id.* at 197.  Focusing solely on Jolene's negligence and product liability

claims against Fabrizi Recycling, the court then considered whether the consent judgment was

invalidated by Cincinnati's lack of consent.  *Id.*  In evaluating this issue, the court first emphasized

that "the record here establishes that, throughout the pendency of the underlying litigation, the

insurance company denied its duty to indemnify the Fabrizi entities."  *Id.*  Citing the decision in *Ward*,

49

the court then discussed the "'frustration of purpose' that may be created when, as in this case, an insurance company defends in an action, but maintains that it is not liable to indemnify." *Id*. at 198. The court concluded, similar to *Ward*, that "the Fabrizi entities' decision to settle without Cincinnati Insurance's consent was not arbitrary or unreasonable and, therefore, that its rights under the policy were not forfeited by the consent judgment." *Id.* at 199.

In so finding, the court noted that "the insurance company did not file a declaratory judgment during the time the underlying action was being litigated, so that the coverage issue could be resolved." *Id*. Thus, the court reasoned, Cincinnati "created the problem this court discussed in *Ward*: maintaining control of the litigation while at the same time denying coverage." *Id*. The court also was not persuaded by Cincinnati's position that Jolene and the Fabrizi entities "cut off" the fact-finding process by entering into the consent judgment, given the lengthy discovery process and "extensive efforts to resolve the case out of court." *Id*. In sum, the court found that:

> [O]n the facts and circumstances of this case, the consent judgment was not improper. We find the insurance company's contention that the [consent] judgment breached several provisions of the insurance policy (i.e., the anti-assignment, voluntary payment, cooperation, and no action clauses, which all involve consent on the insurance company's part to settle a claim) to be without merit.

*Id.* The court then considered whether there was coverage under the policy, concluding that "there is a genuine issue of material fact as to Cincinnati's duty to indemnify Recycling in this case" and remanding for further proceedings. *Id*. at 201.

Thus, under *Ward* and *Patterson*, Caraballo's failure to obtain PESLIC's consent to settle with the Estate is excused if, and only if, the following two conditions are met: (1) PESLIC "maintained control of" the underlying state court litigation, (2) while at the same time denying

coverage. The Court will address the parties' arguments with respect to each of these conditions separately, below.

### 1. Control of the Litigation

PESLIC argues that Caraballo's material breach of the Policies' consent-to-settle provisions is not excused under *Ward* and *Patterson* because "the undisputed facts confirm that PESLIC did not control Caraballo's defense." (Doc. No. 110 at p. 15.) In support of this argument, PESLIC relies heavily on Attorney Forbes' testimony that (1) PESLIC did not retain Forbes to represent Caraballo; (2) PESLIC did not pay his (i.e., Forbes') attorney's fees; (3) Forbes controlled Caraballo's defense, including deciding what motions to file and what questions to ask during depositions in the state court action; and (4) Caraballo was, at all times, the sole decision maker concerning her defense, with his guidance. (*Id.*)

The Estate argues, however, that there are "substantial issues of fact and credibility that must be determined by the trier of fact before a declaratory judgment can be issued." (Doc. No. 112 at pp. 2, 4.) The Estate maintains that a jury could decide that PESLIC controlled the litigation in light of evidence that Attorney Forbes "based his entire trial preparation on the basis that this was a joint defense between Catholic Charities and Ms. Caraballo." (*Id.* at p. 11.) Moreover, citing both Attorney Forbes' and Mr. Bonanni's deposition testimony, the Estate argues that there are genuine issues of material fact regarding whether PESLIC "assumed the duty to defend Catholic Charities" by retaining Attorney Patton; directed Catholic Charities to refuse to assist Attorney Forbes after appealing the state court's denial of its summary judgment motion on political subdivision immunity; and/or otherwise "controlled the litigation" in the underlying State Court Action. (*Id.* at pp. 11-15.)

For the following reasons, the Court finds that the Estate has failed to demonstrate that there is a genuine issue of material fact that PESLIC maintained control of the underlying state court litigation. As an initial matter, the Court finds (as it did in its January 17, 2023 Memorandum Opinion & Order) that the instant case is materially distinguishable from *Ward* and *Patterson*. In both of those cases, the state courts repeatedly noted that the insurance companies had a duty to defend (and did defend) under the policies at issue. By contrast, here, it is undisputed that PESLIC did not have a duty to defend Caraballo in the underlying State Court Action under either the 2017 or 2019 Policies. Indeed, both of those Policies expressly indicate that PESLIC has "no duty to defend a Claim against an Insured."[16] (Doc. No. 110-2 at PageID# 1713; Doc. No. 110-3 at PageID# 1815.) *See also* Bonanni Depo. at Tr. 25-26.)

Moreover, the Court finds that the Estate has failed to demonstrate that there is a genuine issue of material fact that PESLIC nonetheless did, in fact, defend Caraballo or otherwise "maintain control" of the underlying state court litigation. While Attorney Forbes testified that he decided to collaborate with counsel for Catholic Charities in certain respects, Attorney Forbes made clear that his sole concern was to represent *Caraballo's* interests, and that he was not receiving, following, or

---

[16] The Estate 's reliance on *Sanderson v. Ohio Edison Company*, 635 N.E.2d 19 (Ohio 1994) is likewise misplaced. In that case, the plaintiff, Johnnie Sanderson, was injured when she was hit by a truck started by Dale Allen, the ten year old son of Judith and Thomas Allen. The truck was owned by Thomas Allen's employer, Ohio Edison. Sanderson filed suit against the Allens, alleging negligence. The Allens were insured by policies issued by Ohio Farmers Insurance Company ("Ohio Farmers"). The insurance policies at issue contained a duty to defend. *Id.* at 22. Ohio Farmers, however, refused to defend the suit or participate in any settlement negotiations, on the grounds that there was no coverage. The Allens settled the claim and Sanderson sought satisfaction from Ohio Farmers. The Ohio Supreme Court found that Ohio Farmers breached the policies when it refused to defend the Allens against Sanderson's claims, and that this "material breach relieves [the Allens] of the duty to seek the insurer's assent to and participation in a proposed settlement." *Id.* at 23. Here, however, the 2017 and 2019 Policies expressly state that PESLIC had no duty to defend a Claim against an Insured. Thus, *Sanderson* is materially distinguishable from the instant case and does not support the Estate's argument that Caraballo was relieved of her duty to obtain PESLIC's consent before settling with the Estate.

52

bound by any orders from either PESLIC or Catholic Charities regarding her defense in the State

Court Action.  (Forbes Depo. at Tr. 18-24, 41.)  Specifically, Attorney Forbes testified as follows:

Q: To your knowledge, did PESLIC play any role in your retention to represent Ms. Caraballo?

A: I don't know.  Not to my knowledge.

Q: Who paid your fees in your representation of Ms. Caraballo?

A: Catholic Charities.

Q: Did PESLIC pay your fees to your knowledge?

A: Not that I'm aware of.

Q: … [T]his is going to sound like a silly question, but when you were representing Ms. Caraballo, who was your client?

A: Nancy Caraballo.

Q: Were there any other clients that you represented in that underlying action?

A: No.

Q: In your role as Ms. Caraballo's attorney, whose interests did you prioritize?

***

A: … I didn't prioritize any interests.  My only interests were Ms. Caraballo's.

Q: Thank you for clarifying.  If there were an issue where Catholic Charities had some interests and Ms. Caraballo had some interests, whose interest did you preference?

Mr. Schaefer:  Objection.  Go ahead.

A: Ms. Caraballo's.

Q: If there were situations where PESLIC might have had some interests in an issue and Ms. Caraballo may have had interests in an issue, whose interests did you preference?

53

A:     The only interests I was concerned with were Ms. Caraballo's.

Q:     Ms. Caraballo controlled her own defense in the litigation, is that correct?

A:     Ms. Caraballo was the decision maker with regard to her case with my guidance.

Q:     **Were there any other people who were the decision maker concerning how Ms. Caraballo's defense was conducted apart from Ms. Caraballo herself with your guidance?**

A:     **No.**

(*Id*. at Tr. 14-16) (emphasis added).[17]  Attorney Forbes also expressly testified that neither PESLIC nor Catholic Charities (1) prevented him from asking any questions during depositions or otherwise controlled his conduct during discovery; or (2) prevented him from filing a motion or brief in the state court litigation.[18]  (*Id*. at Tr. 18-20.)  Indeed, Attorney Forbes testified that he filed a brief in opposition Catholic Charities' "scope of employment" summary judgment motion because it was clearly in Caraballo's best interests to do so.  (*Id*.)

The Estate nonetheless argues there is a genuine issue of material fact regarding whether PESLIC effectively controlled the litigation because there are substantial disputes of fact regarding (1) whether PESLIC effectively assumed control of Catholic Charities' defense when it retained Attorney Patton; (2) whether Catholic Charities and Caraballo had a joint defense; and (3) if so, whether PESLIC thereby necessarily controlled the state court litigation as it related to Caraballo by allegedly directing Catholic Charities to (a) file its "frivolous" political subdivision summary

---

[17] Mr. Bonanni, likewise testified that Attorney Forbes was retained by Catholic Charities (and not by PESLIC) to represent Caraballo; and that Catholic Charities (and not PESLIC) was paying Caraballo's defense costs.  (Bonanni Depo. at Tr. 19, 114-115.)

[18] Attorney Forbes testified that the only exception to this is with regard to Caraballo's motion to enforce the settlement agreement with the Estate.  (*Id*. at Tr. 22-23.)

54

judgment motion and interlocutory appeal from the denial thereof; (b) refuse to cooperate with Forbes' request for assistance with experts and motions *in limine*; and (c) refuse to offer a "reasonable" settlement offer to the Estate prior to the September 13, 2021 trial date. In other words, the Estate asserts that there is a fact issue as to whether PESLIC was secretly pulling the strings all along, thereby controlling the course and direction of the state court litigation and creating a situation whereby Caraballo was necessarily negatively impacted when her joint defense with Catholic Charities fell apart.

The Court finds this convoluted argument to be without merit. As an initial matter, it is undisputed that it was it was *Attorney Forbes* who made the decision to collaborate in certain respects with counsel for Catholic Charities in defense of the state court action. The parties do not direct this Court's attention to any evidence that PESLIC or Catholic Charities required, pressured, or unduly influenced Attorney Forbes to collaborate with or participate in a joint defense with Catholic Charities. To the contrary, Attorney Forbes expressly testified that he worked collaboratively with Catholic Charities only "where it was in the best interests of Ms. Caraballo." (Forbes Depo. at Tr. 41-44.) Attorney Forbes repeatedly emphasized that, if he thought collaborating was not in Caraballo's best interests, he would not have done so. (*Id.*)

As an experienced defense attorney, however, Attorney Forbes had to have known that collaborating with Catholic Charities came with some risk. By virtue of the Estate's allegations in the state court litigation, it is clear that Caraballo's interests and Catholic Charities' interests were not entirely aligned.[19] That Catholic Charities would ultimately decide to pursue an interlocutory appeal

---

[19] Indeed, it can be reasonably assumed that this is precisely why Catholic Charities retained separate counsel for Caraballo.

55

and thereafter decline to share its experts and other resources with Caraballo reflects Catholic Charities' and Caraballo's divergent interests and should not necessarily have come to a surprise to Attorney Forbes.  Under the circumstances presented, the Court finds that Catholic Charities' decision to file its interlocutory appeal and refuse to "cooperate" with Attorney Forbes does not create a fact issue regarding whether Catholic Charities (or PESLIC) controlled the state court litigation.  Rather, at best, it is evidence of Catholic Charities' and Caraballo's divergent interests and the calculated risk that Attorney Forbes took by agreeing to collaborate in the first instance.[20]

In light of the above, the Estate's argument that PESLIC effectively controlled Catholic Charities' defense is nothing more than a red herring.  The degree to which PESLIC was or was not involved in Catholic Charities' defense is simply not relevant to the question of whether PESLIC "maintained control of the litigation" *vis a vis* Caraballo.  As discussed at length above, Attorney Forbes testified repeatedly that Caraballo (with his guidance) was the sole decision maker when it came to her defense, and that Attorney Forbes' only concern and objective was to prioritize her interests.  Under the circumstances presented herein, the fact that PESLIC retained Attorney Patton or otherwise allegedly became involved in Catholic Charities' defense does not create a genuine issue of material fact regarding whether PESLIC maintained control of the state court litigation with respect to Caraballo.[21]

---

[20] While Attorney Forbes testified that he believed that PESLIC directed Catholic Charities to refuse to provide cooperation to Forbes regarding experts, etc., Forbes acknowledged that he had no personal knowledge of this and that it was entirely based on "inference."  (Forbes Depo. at Tr. 100-101.)

[21] The Estate makes much of the fact that PESLIC brought in Attorney Patton to represent Catholic Charities but "did not decide to retain new trial counsel to represent Caraballo, even though she was also a putative insured under the Policy." (Doc. No. 112 at p. 15.) However, the Estate does not argue (or direct this Court's attention to any provisions in the Policies that demonstrate) that PESLIC's decision to retain Attorney Patton was improper.  While not cited by either party, the Court notes that the Policies expressly provide that PESLIC "shall have the right and you shall avail us of the opportunity to associate with you in the defense of any Claim that in our sole opinion may create indemnification

Nor does the fact that PESLIC allegedly failed to meaningfully engage in settlement discussions with the Estate create a genuine issue of material fact regarding whether PESLIC "maintained control of the litigation." As discussed *supra*, the 2017 and 2019 Policies provide that the *Insured* is responsible for settlement of any claims. (Doc. No. 110-2 at PageID#1691; Doc. No. 110-3 at PageID# 1795) ("You are responsible for the administration, investigation or settlement of any loss damage, expense or Claim under this policy"). Thus, it was Caraballo - and not PESLIC – that was responsible for negotiating a settlement with the Estate. Moreover, the Court notes that, prior to the month before trial, Attorney Forbes never requested that PESLIC make a settlement offer on Caraballo's behalf. (Forbes Depo. at Tr. 102-103, 114.)

Accordingly, and for all the reasons set forth above, the Court finds that the Estate has failed to come forward with sufficient evidence from which a reasonable jury could find that PESLIC "maintained control of" the state court litigation under *Ward* and *Patterson, supra*. As such, PESLIC is entitled to summary judgment in its favor on Count I on this basis alone. However, out of an abundance of caution, the Court will also address the parties' arguments with respect to the second condition in *Ward* and *Patterson*, i.e., whether there is genuine issue of material fact that PESLIC denied coverage to Caraballo.

### 2. Denial of Coverage

---

obligations for us under this Coverage Party." (Doc. No. 110-2 at PageID# 1713.) Thus, while there is no *duty* to defend under the Policies, this provision *allows* PESLIC to participate in the defense of a Claim if it so chooses. PESLIC was, therefore, entitled to "associate with" Catholic Charities in its defense of the Estate's claims. PESLIC was also entitled to "associate with" Caraballo's defense if it so chose, but it was not required to do so under the Policies. Notably, the Estate has not directed this Court's attention to any language in the Policies that dictates that, once PESLIC decided to "associate" in the defense of one of its Insureds, it was necessarily required to associate in the defense of all of its putative Insureds. Finally, the Court notes that Attorney Forbes testified in deposition that, prior to September 2021, he never requested that PESLIC assist in Caraballo's defense. (Forbes Depo. at Tr. 102-103.)

PESLIC next argues that the evidence is clear that it "did not deny coverage to Caraballo." (Doc. No. 110 at p. 15.)  Specifically, PESLIC maintains that it "repeatedly informed Caraballo that coverage could be available under both the 2017 and 2019 Policies" and, further, that  it expressly confirmed in September 2021 that it would indemnify Caraballo's cost to defend any covered claims, including expert witness fees.  (*Id*.)  PESLIC also notes that Attorney Forbes himself "acknowledge[d] that PESLIC has not expressly denied coverage to Ms. Caraballo …"  (*Id*. at p. 16) (citing Doc. No. 110-15.)

In response, the Estate argues generally that "it was apparent that PESLIC refused to agree to indemnify" Caraballo.  (Doc. No. 112 at p. 8.)  The Estate faults PESLIC for failing to file a declaratory judgment action sooner in order to clarify its coverage position.  (*Id*.)  The Estate also asserts repeatedly that PESLIC "abandoned" her by allegedly directing Catholic Charities not to cooperate with Attorney Forbes and failing to engage in "reasonable settlement negotiations" with the Estate.  (*Id*. at p. 10, 11-12, 15.)

For the following reasons, the Court agrees with PESLIC that there is no evidence from which a reasonable jury could conclude that PESLIC denied coverage to Caraballo.  While PESLIC did reserve its rights under the Policies and raise potential coverage issues in both its June 28, 2019 and July 30, 2021 letters, PESLIC did not reach or communicate a final coverage determination in either of those letters or otherwise express that it was denying coverage to Caraballo under the Policies.  *See* Doc. Nos. 110-4, 110-7.  Indeed, in his September 3, 2021 letter to Attorney Forbes, Mr. Bonanni emphasized that "[b]y issuing a reservation of rights letter, PESLIC has not denied indemnity for Caraballo."  (Doc. No. 110-19 at PageID# 2068).  To the contrary, Mr. Bonanni explained, "[i]f a judgment, after an actual trial, is entered against Caraballo that is covered by the Policies, then

PESLIC agrees to indemnify Caraballo against that judgment." (*Id.*)  Mr. Bonanni further indicated that "PESLIC will indemnify Caraballo, up to the limits of the Policy, for any covered judgment entered against her should she forego the current settlement proposed by [the Estate]." (*Id.* at PageID# 2069.)

In response to Mr. Bonanni's September 3, 2021, letter, Attorney Forbes "acknowledge[d] that PESLIC has not expressly denied coverage" but complained that he believed Caraballo had been placed in a terrible position and exposed to significant financial and psychological risk.  (*Id.* at PageID# 2071.)  PESLIC responded (through coverage counsel, Monica Sullivan) via letter dated September 6, 2021.  (Doc. No. 110-16.)  Therein, Ms. Sullivan stated that "[t]he purpose of this response is to reiterate and further confirm that PESLIC will indemnify for all costs incurred to defend Ms. Caraballo against covered claims, including all reasonable defense costs and expert witness fees necessary to defend her at an actual trial on the merits."  (*Id.* at PageID# 2041.)  Ms. Sullivan also advised that PESLIC "agrees to provide indemnity for any supersedeas bond, up to its policy limits, necessary for Ms. Caraballo to appeal any covered judgment entered against her."  (*Id.*)

PESLIC's communications to Caraballo are in stark contrast to both *Ward* and *Patterson*, in which the state courts noted that the insurers expressly and repeatedly denied coverage.  In *Ward*, for example, the state appellate court noted that "[a]t all times, American maintained that its policy did not cover the injury sustained by [Ward], a notice implied and actual that it would not pay if Custom was found liable." *Ward,* 105 Ohio App.3d at 135.  Likewise, in *Patterson*, the state appellate court stated that "[t]he record here establishes that, throughout the pendency of the underlying litigation, the insurance company denied its duty to indemnify the Fabrizi entities."  *Patterson*,  91 N.E.3d at 197.

Notably, the Estate has not directed this Court's attention to any evidence that PESLIC ever expressly communicated to Caraballo that it was denying coverage under the Policies.  The Estate, however, appears to assert that a reasonable jury could nonetheless conclude that PESLIC effectively denied coverage because PESLIC failed to either (1) affirmatively agree to provide coverage to Caraballo (prior to judgment or trial) with respect to all the Estate's claims; or (2) timely file a declaratory judgment action to clarify coverage.  The Court finds the Estate's arguments to be without merit.  PESLIC's reservation of rights under the Policies is not the same as the denial of coverage. Indeed, as this Court has already held, the fact that "PESLIC failed to take a position on coverage and refused to 'timely accept' or contest coverage … is not the same as …PESLIC [making] the decision to deny coverage and communicat[ing] that decision to the insureds, as was the case in both *Ward* and *Patterson*."  (Doc. No. 65 at p. 24.)  Moreover, the Estate does not direct this Court to any legal authority that PESLIC was required to file a declaratory judgment action earlier in the course of the state court litigation.

Moreover, to the extent the Estate argues that summary judgment should be denied because PESLIC "abandoned" Caraballo, this argument is without merit.  As an initial matter, the issue under *Ward* and *Patterson* is not whether PESLIC "abandoned" Caraballo.  Rather, the issues under *Ward* and *Patterson* are whether PESLIC (1) maintained control of the litigation (2) while denying coverage.  As discussed at length *supra*, the Court finds that the Estate has failed to come forward with sufficient evidence to demonstrate a genuine issue of material fact as to either of these two elements.  Moreover, even assuming *arguendo* that "abandonment" is an element under *Ward* and *Patterson*, the Court is not persuaded that there is a genuine issue of material fact that PESLIC did, in fact, abandon Caraballo.  As discussed at length above, PESLIC repeatedly confirmed that it would

60

indemnify Caraballo for any covered claims. Further, the only evidence that PESLIC directed Catholic Charities to file its interlocutory appeal and/or refuse to cooperate with Attorney Forbes is Forbes' unsupported and speculative "inference" that PESLIC must have done so.  (Forbes Depo. at Tr. 99-101.)  Attorney Forbes himself acknowledged that he had no personal knowledge that PESLIC directly participated in these decisions.  (*Id*.)  To the contrary, Mr. Bonanni expressly testified that the decisions to file an interlocutory appeal and to refuse to cooperate with Attorney Forbes were made by Catholic Charities' trial team – not by PESLIC.  (Bonanni Depo. at Tr. 99-100, 103, 108-109, 110.)  Mr. Bonanni also testified that Catholic Charities handled the settlement negotiations with the Estate – not PESLIC.  (*Id*. at Tr. 77-78.)  The Estate has cited no evidence to the contrary, aside from Attorney Forbes' unsupported speculation that PESLIC directly participated in these aspects of Catholic Charities' defense.

In light of the above, the Court finds that the Estate has failed to come forward with sufficient evidence from which a reasonable jury could find that PESLIC "denied coverage" to Caraballo for purposes of *Ward* and *Patterson, supra.*

**IV.    Conclusion**

Accordingly, and for all the reasons set forth above, PESLIC's Motion to Exclude the Expert Report and Testimony of Judge William Taylor (Doc. No. 114) is GRANTED.  PESLIC's Motion for Summary Judgment (Doc. No. 110) on Count I of its Complaint is also GRANTED.  The Court finds that there is no genuine issue of material fact that PESLIC is entitled to a declaration that:  (1) Caraballo materially breached the 2017 and 2019 Policies because Caraballo failed to obtain PESLIC's written approval to the settlement between herself and the Estate in the underlying State Court Action; (2) Caraballo's material breach was not excused by the exception set forth in *Ward*

and/or *Patterson*; and (3) PESLIC therefore owes no obligations under the Policies (including the obligation to indemnify) to Caraballo or her assignees, including the Estate.  In light of the above, the Court further finds that it need not reach Count II of PESLIC's Complaint, which was pled in the alternative.

**IT IS SO ORDERED.**


_s/Pamela A. Barker_
PAMELA A. BARKER
Date:  May 21, 2024                          U. S. DISTRICT JUDGE